704 P.2d 774 (1985)
D.E.D., Appellant,
v.
STATE of Alaska, Appellee.
No. S-553.
Supreme Court of Alaska.
August 23, 1985.
*776 James M. Hackett, Fairbanks, for appellant.
James H. Cannon, Asst. Public Defender, Fairbanks, Dana Fabe, Public Defender, Anchorage, guardian ad litem.
Myra M. Munson, Asst. Atty. Gen., Fairbanks, Norman C. Gorsuch, Atty. Gen., Juneau, for appellee.
Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

OPINION
RABINOWITZ, Chief Justice.
R.S. seeks the return of her infant child, alleging that the various proceedings leading to the superior court's termination of her parental rights violated the Indian Child Welfare Act and state law in that she was deprived of her right to counsel. We hold that the superior court's judgment should be affirmed on the grounds that the evidence demonstrates beyond a reasonable doubt that the child was abandoned by its mother and that there were no jurisdictional or procedural defects in the proceedings leading to the parental rights termination.
D.E.D. is an Indian child within the meaning of the Indian Child Welfare Act (ICWA). 25 U.S.C. § 1901 et. seq. (1983). *777 He was born on September 27, 1983. R.S., an Inupiat Eskimo, is D.E.D.'s mother.[1]
When D.E.D. was one month old, R.S. sought assistance from the Division of Family and Youth Services (DFYS). She met with DFYS social worker Dorothy Hafler and told Hafler that she was unable to care for D.E.D. because she had no place to live and no money. R.S. executed a voluntary placement agreement which allowed the state to provide temporary foster care for D.E.D. In addition to specifically stating the beginning and ending dates of the placement period (October 27 to November 27, 1983), the agreement provided that R.S. could resume custody at any time. Hafler explained the agreement to R.S. and specifically indicated to R.S. that she could resume custody on demand. Hafler also suggested a variety of services to R.S.
R.S. told Hafler that she intended to use the agreement for a few days or a week. R.S. was given the phone number of the foster home,[2] and she was encouraged to visit. Two visits were arranged, but R.S. never came to see her son. R.S. did, however, call the foster home at 3:00 and 4:00 in the morning, while intoxicated, and so frequently that the foster parents asked that D.E.D. be removed.
R.S. did not resume custody at the expiration of the 30 day voluntary placement and Hafler was unable to locate her.[3] Hafler assumed emergency custody pursuant to AS 47.10.142 on November 27, 1983, the date the placement expired.[4] Hafler testified that she did so because she didn't know how to reach R.S.
Hafler petitioned the superior court for temporary custody of D.E.D. on November 29, 1983. Her petition explained that R.S. had neither called for nor picked up D.E.D. and that DFYS had been unable to locate D.E.D.'s parents. The superior court granted DFYS temporary custody until December 28.
On December 5, 1983, Hafler sent a note telling R.S. that Hafler would have to take custody of D.E.D. because she had not heard from R.S. The note stated in part:
I will need to help you make good plans for yourself before you can have him back... . But you cannot take him home until after we make a plan.[5]
On December 27, 1983, the superior court extended the State's temporary custody to March 9, 1984, to allow time for the parents to be served with notice before trial. R.S. did not file an objection to the extension. On January 5, 1984, a petition for adjudication as a child in need of aid was filed.
R.S. was served with a summons on January 24, 1984. The face of the summons stated that she had the right to be represented by an attorney and if she could not afford one, she could ask the court to appoint one for her at state expense. When R.S. appeared in court on March 9, 1984, the court appointed counsel from the bench.[6]
*778 Temporary custody was extended on March 16, 1984 and a stipulation for adjudication of child in need of aid, signed by all parties, their counsel and the guardian ad litem, was filed on May 11, 1984. The stipulation specifically stated that R.S. and D.D. were aware that the court could terminate their parental rights at the hearing.
A pretrial conference was held on June 21, 1983 in which no procedural or substantive issues were raised by R.S.'s attorney. However, on the morning of the trial, R.S.'s counsel served the parties with a petition requesting return of D.E.D. under ICWA.
The State called numerous witnesses, three of whom qualified as experts. The three experts agreed that the parent-child bond between R.S. and D.E.D. was effectively destroyed by her failure to visit her son, that given her history and lack of response to the extensive services offered her,[7] R.S.'s behavior was likely to continue, and that D.E.D. was likely to suffer serious physical or emotional damage if returned to R.S.'s custody. R.S. called no witnesses.
The superior court found that it would be in D.E.D.'s best interests if parental rights were terminated:
There is evidence beyond a reasonable doubt that [D.E.D.] is a child in need of aid as a result of his parents' conduct under AS 47.10.010(a)(2)(A) based on the abandonment by his mother and father in that they have consciously disregarded their obligation to maintain or establish a parent/child relationship with him and that conduct has resulted in the destruction of the parent/child relationship, and their inability to provide for his physical, social, emotional, and mental needs.
There is evidence beyond a reasonable doubt that this conduct is likely to continue if the parents' parental rights are not terminated.
There is evidence beyond a reasonable doubt that [D.E.D.] is likely to suffer serious physical or emotional damage if he were returned to the custody of his parents or if parental rights were not terminated.
There is evidence beyond a reasonable doubt that active efforts have been made to provide remedial services to prevent the breakup of this family and that these services have proved unsuccessful or have been rejected by the parents.
D.D. did not contest termination and both his and R.S.'s parental rights were terminated. R.S.'s motion for a stay was denied. R.S. now appeals.

I. WAS R.S. DENIED THE RIGHT TO COUNSEL UNDER THE INDIAN CHILD WELFARE ACT (ICWA)?
ICWA states that an Indian parent "shall have the right to court-appointed counsel in any removal, placement, or termination proceeding" where the court has determined that the parent is indigent. 25 U.S.C. § 1912(b) (1978). There is no dispute that the provisions of this section apply to D.E.D. and R.S. Nor is there any dispute that R.S. was represented by counsel at the trial in which her parental rights *779 were terminated. R.S.'s primary contention is that she was deprived of her right to counsel under ICWA because the State failed to fulfill the notice requirements of § 1912(a).
Under § 1912(a), no foster placement proceeding can be held unless the parent has been given 10 days notice by registered mail or, if the parent cannot be found, the Secretary of Interior has been notified. R.S. contends that the State did not attempt to give notice to her or the Secretary of either the November 29th hearing or the December 27th hearing. R.S. claims that the State's failure to fulfill the notice requirements of § 1912(a) effectively deprived her of her right to counsel, since the issuance and receipt of statutory notice includes notification of the right to counsel.[8]
The State argues that R.S.'s reliance on the notice requirements of § 1912(a) is misplaced because the November 29 and December 27 hearings were emergency custody proceedings and thus fell under 25 U.S.C. § 1922 and not § 1912.
Section 1922 states in part:
Nothing in this subchapter [§§ 1911-1923] shall be construed to prevent the emergency removal of an Indian child ... from his parent or Indian custodian or the emergency placement of such child in a foster home or institution, under applicable State law, in order to prevent imminent physical damage or harm to the child.
Section 1922 goes on to state that the court is to "expeditiously initiate a child custody proceeding." Section 1922 is not explicitly limited to situations in which the child is in the parents' custody.
The State is correct in its characterization of the November 27 hearing as an emergency custody proceeding falling under § 1922. As of November 27, the voluntary placement agreement had expired, R.S. had failed to retrieve her son, and she was nowhere to be found. The foster parents with whom D.E.D. had been placed under the voluntary agreement were no longer obligated to care for him. At that point, D.E.D. became an abandoned child and thus a child in need of aid under AS 47.10.010(a)(2)(A). In this situation, emergency intervention is required under § 1922 and for obvious reasons the 10 day notice R.S. demands is not applicable. By the same token, the December 27 hearing was also emergency in nature.
Since the November 29 and December 27 proceedings were emergency hearings, the notice requirements of § 1912(a) were not applicable to R.S., and she was not deprived of her right to counsel under ICWA by the State's failure to notify her.[9]

*780 II. SHOULD THE SUPERIOR COURT HAVE DECLINED JURISDICTION?
R.S. asserts that the superior court committed reversible error in not declining jurisdiction as requested in her Petition for Return filed on the morning of trial. Neither the Petition for Return nor its supporting memo stated the basis for the request to decline jurisdiction.[10]
The supporting memo merely cites A.B.M. v. M.H., 651 P.2d 1170 (Alaska 1982) which arose not under §§ 1913 or 1920 but under 25 U.S.C. § 1916(a) (1983).[11] Thus, as the State notes, there was nothing in R.S.'s petition which demonstrated that there was any basis for declining jurisdiction under either § 1913 or § 1920. The only other times R.S. challenged the superior court's jurisdiction were at the close of cross-examination, where R.S.'s counsel stated that he was willing to make a legal argument as to jurisdiction under § 1920, and in closing argument where opaque references were made to the jurisdictional question. Thus, R.S. never requested the superior court to rule on the jurisdictional issues she now specifies as error. Since the issue was never properly raised below, we do not consider it here.
Alternatively, assuming the jurisdictional point was properly raised below, we find it without merit. R.S. claims that since D.E.D. was "improperly removed" within the meaning of § 1920 by the October agreement, and by the November and December temporary custody proceedings, the *781 superior court should have declined jurisdiction and returned D.E.D. to R.S.
R.S. asserts that custody taken pursuant to the October 27 voluntary agreement was improper because the agreement was neither executed nor certified according to § 1913(a) of ICWA.[12] We agree with the State that the voluntary foster care placement agreement R.S. signed is not subject to ICWA.
AS 47.10.230(c) authorizes DHSS to place minors under "individual voluntary written agreements" for up to 6 months. The statute specifically states that these agreements "shall not operate to prohibit a minor's parent ... from regaining care of the minor at any time." DHSS provided a form agreement, which R.S. signed. The agreement specifically stated, immediately above the signature line:
I have read the above statements or have had them read to me and I understand them. I also understand that this agreement is voluntary and that I have the right to regain custody of the child at any time.
25 U.S.C. § 1903(1) defines the types of proceedings covered by ICWA:
(1) "child custody proceeding" shall mean and include 
(i) "foster care placement" which shall mean any action removing an Indian child from its parent or Indian custodian for temporary placement in a foster home or institution or the home of a guardian or conservator where the parent or Indian custodian cannot have the child returned upon demand, but where parental rights have not been terminated;

(ii) "termination of parental rights" which shall mean any action resulting in the termination of the parent-child relationship;
(iii) "preadoptive placement" which shall mean the temporary placement of an Indian child in a foster home or institution after the termination of parental rights, but prior to or in lieu of adoptive placement; and
(iv) "adoptive placement" which shall mean the permanent placement of an Indian child for adoption, including any action resulting in a final decree of adoption. (Emphasis added.)
The voluntary care agreement entered into by R.S. does not fall into ICWA's definition of "foster care placement" since R.S. could have D.E.D. returned to her "at any time."[13] Nor does it come within any of the other categories listed in § 1903(1). Thus, the agreement R.S. signed did not fall under ICWA.
The guidelines support this conclusion. Guideline B.3(c) states that "[v]oluntary placements which do not operate to prohibit the child's parent ... from regaining custody of the child at any time are not covered by the Act." 44 Fed.Reg. 67587.
Commentary to guideline B.3, which explains the reasons for creating this exception, specifically refers to the type of agreement signed by R.S. and stresses how such agreements are to be structured so that ICWA will not apply to them:
Some private groups and some states enter into formal written agreements *782 with parents for temporary custody (See e.g. Alaska Statutes § 47.10.230). The guidelines recommend that the parties to such agreements explicitly provide for return of the child upon demand if they do not wish the Act to apply to such placements. Inclusion of such a provision is advisable because courts frequently assume that when an agreement is reduced to writing, the parties have only those rights specifically written into the agreement. (Emphasis added.)
44 Fed.Reg. 67588.
The agreement fulfilled the guidelines' suggestions for voluntary placement agreements. It was explained to R.S. and it is apparent that she understood its terms from her statement to Hafler that she intended to use it only for a few days or a week. Since the agreement signed by R.S. is not subject to the provisions of ICWA, it did not have to satisfy the requirements of § 1913 and, therefore, it could not furnish a basis for the court to decline jurisdiction under § 1920 and return D.E.D. to R.S.[14]
It is also clear that § 1920 is not the proper remedy for the alleged violations of which R.S. complains. The legislative history of § 1920 states as follows:
Section 110 [25 U.S.C. § 1920] establishes a "clean hands" doctrine with respect to petitions in State court for the custody of an Indian child by a person who improperly has such child in physical custody. It is aimed at those persons who improperly secure or improperly retain custody of the child without the consent of the parent or Indian custodian and without the sanction of law. It is intended to bar such persons from taking advantage of their wrongful conduct in a subsequent petition for custody. The child is to be returned to the parent or Indian custodian by the court unless such return would result in substantial and immediate physical danger or threat of physical danger to the child. It is not intended that any such showing be by or on behalf of the wrongful petitioner. (Emphasis added.)
H.R.Rep. No. 1386, 95th Cong., 2nd Sess. 25 (1978), reprinted in 1978 U.S.Code Cong. & Ad.News 7530, 7548.
DFYS took the case to the superior court promptly at the expiration of the October agreement and again at the end of the 30 day temporary custody period. In addition, the superior court had an adequate basis for its December 27 order extending temporary custody, because it had the State's supporting memorandum regarding R.S.'s knowledge that D.E.D. was in custody and her failure to either visit the child or contact DFYS. Thus, no removal or retention of D.E.D. occurred "without the sanction of law."

III. WERE ANY PROCEDURAL OR JURISDICTIONAL ERRORS RENDERED HARMLESS BY A SUBSEQUENT, PROCEDURALLY CORRECT HEARING?
The State argues that even if ICWA's provisions were violated in relation to the two temporary custody proceedings, this court is not required to set aside the superior court's subsequent decree terminating parental rights which was reached after compliance with ICWA. We conclude that even if the procedural and jurisdictional defects asserted by R.S. existed in the earlier temporary custody hearings, they were cured by the subsequent procedurally correct final dispositional hearing which occurred five months after R.S. was appointed counsel and three months after her counsel stipulated that D.E.D. was a child in need of aid.[15]

*783 IV. WAS THERE SUFFICIENT EVIDENCE TO FIND THAT R.S. HAD ABANDONED D.E.D.?
The superior court has the authority to terminate parental rights pursuant to AS 47.10.080(c)(3),
upon a showing in the adjudication by clear and convincing evidence that there is a child in need of aid under AS 47.10.010(a)(2) as a result of parental conduct and upon a showing in the disposition by clear and convincing evidence that the parental conduct is likely to continue to exist if there is no termination of parental rights... .
In proceedings which fall under ICWA, the court's determination must also be "supported by evidence beyond a reasonable doubt, ... that the continued custody of the child by the parent ... is likely to result in serious emotional or physical damage to the child." 25 U.S.C. § 1912(f). A minor is a child in need of aid under AS 47.10.010(a)(2)(A) if he has been physically abandoned by his parents, or by one parent if the other parent's rights have been voluntarily relinquished.
The superior court found that there was evidence beyond a reasonable doubt establishing that R.S. had abandoned D.E.D., that her conduct was likely to continue and that D.E.D. would suffer serious damage if he were left in R.S.'s custody. R.S. asserts that the superior court lacked sufficient evidence to determine that she had abandoned D.E.D. We disagree.
The test for abandonment has two prongs: (1) has the parent's conduct evidenced a disregard for her parental obligation, and (2) has that disregard led to the destruction of the parent-child relationship. Nada A. v. State, 660 P.2d 436 (Alaska 1983). Abandonment is not determined by the parent's subjective intent, but by "objective evidence of parental conduct." Matter of E.J.(T.), 557 P.2d 1128, 1130-31 (Alaska 1976) (quoting In re Adoption of V.M.C., 528 P.2d 788, 793 (Alaska 1974)); see also Matter of D.M. v. State, 515 P.2d 1234, 1237 (Alaska 1973). A superior court's finding of abandonment will not be overturned on review unless it is clearly erroneous. Matter of E.J.(T.), 557 P.2d at 1132.
There is ample evidence in the record that R.S.'s conduct "implie[d] a conscious disregard of the obligations owed by a parent to the child, leading to the destruction of the parent-child relationship." Matter of D.M., 515 P.2d at 1237. Despite the fact that R.S. was continually encouraged by her social workers to visit D.E.D., she saw him only once prior to her court appearance on March 9, 1984. Subsequent to that hearing, she saw D.E.D. twice, and then missed or cancelled visits on several other occasions. The total amount of time R.S. spent visiting D.E.D. between October 27, 1983 and the June 25, 1984 hearing was a little over two hours. She was unable to provide the superior court with an explanation of why she failed to visit her son: "I don't know. Don't ask. I don't have an answer for that." The expert witnesses unanimously concluded that, because of D.E.D.'s age, lack of contact between R.S. and D.E.D. had destroyed the parent-child bond.
The experts also agreed that based on R.S.'s past conduct and her lack of response to the services offered her, there was little likelihood that her behavior would change, and that serious physical or emotional damage would occur to D.E.D. if he were returned to R.S.'s custody. In light of the foregoing, we conclude that the *784 superior court's decision to terminate R.S.'s parental rights on the basis of her abandonment of D.E.D. is supported by substantial evidence.
AFFIRMED.
NOTES
[1] D.E.D.'s father, D.D., initially denied paternity and later testified that he was willing to relinquish his paternal rights.
[2] The foster mother was also Native American, although not Inupiat.
[3] Despite repeated requests, R.S. never gave Hafler a good address or telephone number. She reported 16 addresses to her probation officer between 1982 and 1984.
[4] AS 47.10.142(a) provides:

The Department of Health and Social Services may take emergency custody of a minor upon discovering .. . (1) the minor has been abandoned; ... .
[5] On December 7, 1983, the State moved ex parte for the appointment of a guardian ad litem. An attorney was appointed for D.E.D. on December 8, 1983.

D.E.D.'s case was assigned to DFYS social worker Ernie Collins about December 12, 1983. Collins testified that he spoke to R.S. on December 27 and that she made several appointments to see him which she did not keep. R.S. succeeded in meeting with Collins on January 10, 1984. He referred her to pretrial services for appointment of counsel.
[6] On February 10, 1984, Debra McKelvie, a Fairbanks Native Association (FNA) counselor, told R.S. that it was important she obtain an attorney. On February 17, 1984, McKelvie actually took R.S. from FNA to the court building and reiterated the importance of getting an attorney, but R.S. said she could do so herself. On March 7, 1984, McKelvie repeated that it was important that R.S. receive representation and R.S. responded that she chose not to be represented.
[7] Denise Smart suggested to R.S. that she seek assistance from a variety of service agencies: Fairbanks Native Association (FNA), the Fairbanks Health Center, the Women, Infants and Children (WIC) program (a nutritional supplement program), and Aid to Families with Dependent Children (AFDC). Smart explained each program and offered R.S. transportation to FNA. Smart drove R.S. to and from FNA the following day. Smart attempted additional follow-up supervision, but R.S. had moved without leaving a forwarding address or telephone number.

When R.S. was taken to FNA by Smart, she applied for an Indian Child Welfare grant, was referred to the WIC program, was given an AFDC application and use of the phone to make an appointment with AFDC, was told about parenting classes and was offered transportation. A food basket, diapers and clothes were delivered to R.S. that day. Although she picked up her Indian Child Welfare grant check, she failed to keep her appointment with AFDC. She testified that she thought the application form was "too hard" to fill out. She also complained that she couldn't get transportation to AFDC, but had no explanation for why she failed to accept FNA's offer of transportation.
[8] R.S. notes that the federal guidelines to § 1912 indicate that the State should have provided the court with a "detailed explanation of what efforts have been made to locate [the parents]," B.7(b)(ii), and a "statement of the specific actions that have been taken to assist the parents ... so the child may safely be returned to their custody." B.7(b)(vii). Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67589. While the Guidelines are not binding on state courts they are considered instructive. See 44 Fed.Reg. 67584. R.S. contends that these guidelines were not fulfilled since the state never provided the court with an explanation of what efforts were made to find R.S. or with a statement of what steps the State had taken to assist R.S. in having D.E.D. returned to her.

R.S. also cites Rule 15(a)(3) and (4) of the Alaska Children's Rules to show that the court should have appointed her counsel at the November 29 and December 27 hearings. Rule 15 provides as follows:
(a) When the Court Shall Appoint Counsel. The court shall appoint counsel to represent the child, his parents, guardian, or custodian, when the assistance of counsel is desired, as follows:
... .
(3) For his parents, guardian, or custodian when they are financially unable to employ counsel to represent themselves and the issues are complex or have serious consequences.
(4) For the child, his parents, guardian, or custodian in any situation where, in the opinion of the court, the interests of justice and the nature of the case warrant providing the assistance of counsel at the taxpayer's expense.
[9] The State also argues that R.S. chose not to be represented in the earlier hearings. The State observes that R.S. could not be found as of November 29, since she had not contacted DFYS and had given DFYS no way of contacting her and therefore, she could not have been notified of that hearing. Moreover, after the November 29 hearing, R.S. received several communications giving her notice of the December 27 hearing which she ignored. She received a letter from Hafler enclosing court paperwork; Hafler spoke to R.S. by phone on December 8; the Motion to Extend Temporary Custody was mailed to R.S. on December 21; Collins wrote to R.S. regarding the proceedings and she received his letter on December 14. Since R.S. failed to follow through after learning about the November 29 hearing and after she was repeatedly told to get counsel, the State contends that "even if R.S. had been served with a formal notice of her right to counsel on November 27th she would not have exercised it."

We are unconvinced by this assertion. If, indeed, the State was required to notify R.S., the Secretary of Interior should have been given notice if R.S. could not be found. Even the irresponsible are entitled to due process.
[10] R.S. stated in her brief that the request was made pursuant to 25 U.S.C. §§ 1913(b) and 1920 (1978). Section 1913(b) provides:

Any parent or Indian custodian may withdraw consent to a foster care placement under State law at any time and, upon withdrawal, the child shall be returned to the parent or custodian.
25 U.S.C. § 1920 states:
Where any petitioner in an Indian child custody proceeding before a State court has improperly removed the child from custody of the parent or Indian custodian or has improperly retained custody after a visit or other temporary relinquishment of custody, the court shall decline jurisdiction over such petition and shall forthwith return the child to his parent or Indian custodian unless returning the child to his parent or custodian would subject the child to a substantial and immediate danger or threat of such danger. (Emphasis added.)
Guideline B.8 to 25 U.S.C. § 1920 states as follows:
(a) If, in the course of any Indian child custody proceeding, the court has reason to believe that the child who is the subject of the proceeding may have been improperly removed from the custody of his or her parent or Indian custodian or that the child has been improperly retained after a visit or other temporary relinquishment of custody, and that the petitioner is responsible for such removal or retention, the court shall immediately stay the proceedings until a determination can be made on the question of improper removal or retention.
(b) If the court finds that the petitioner is responsible for an improper removal or retention, the child shall be immediately returned to his or her parents or Indian custodian. (Emphasis added.)
44 Fed.Reg. 67590.
[11] Section 1916(a) provides:

Notwithstanding State law to the contrary, whenever a final decree of adoption of an Indian child has been vacated or set aside or the adoptive parents voluntarily consent to the termination of their parental rights to the child, a biological parent or prior Indian custodian may petition for return of custody and the court shall grant such petition unless there is a showing, in a proceeding subject to the provisions of section 1912 of this title, that such return of custody is not in the best interests of the child.
[12] Section 1913(a) provides in pertinent part:

Where any parent or Indian custodian voluntarily consents to a foster care placement or to termination of parental rights, such consent shall not be valid unless executed in writing and recorded before a judge of a court of competent jurisdiction and accompanied by the presiding judge's certificate that the terms and consequences of the consent were fully explained in detail and were fully understood by the parent or Indian custodian. The court shall also certify that either the parent or Indian custodian fully understood the explanation in English or that it was interpreted into a language that the parent or Indian custodian understood... .
[13] While the October 27 agreement fulfilled the literal requirements of the ICWA guidelines, it did not explicitly state, nor was it ever explained to R.S. what the harsh consequences might be of failing to demand return of D.E.D. prior to the agreement's expiration date. In fact, without such a warning, the agreement's language ("at any time") seems to be somewhat deceptive. However, R.S. failed to raise this issue either here or below and since it is not properly before us, we will not consider it.
[14] R.S. also contends that the November and December temporary custody proceedings were improper because she lacked statutory notice and was thereby deprived of her right to counsel. As discussed above, these claims are meritless.
[15] The Supreme Court of Montana addressed a similar question in Matter of M.E.M., 679 P.2d 1241 (Mont. 1984). There it was held that ICWA "does not provide for invalidation of a valid separate action because of an invalid prior one." Id. at 1243. The court noted the following:

The temporary and permanent custody proceedings . .. were separate actions resulting in court orders granting different forms of relief... .
In terminating [the mother's] parental rights, the [trial court] did not rely upon the prior temporary custody proceedings. The court noted the temporary custody proceedings in its findings of fact, but emphasized separate testimony from the permanent custody hearing regarding the condition of the child and the parents' ability to care for the child... .
[T]he temporary custody proceedings were not a legal prerequisite to termination of parental rights.
Id. at 1243-44.