*Godfrey v. United States*, 748 F.2d 1568, 1576 (Fed.Cir.1984). The key to liability is "significant control or authority over an enterprise's finances or general decision-making." *Ruth v. United States*, 823 F.2d 1091, 1094 (7th Cir.1987).

 **F.T., Appellant,**

v.

**STATE of Alaska, Appellee.**

**No. S–4626.**

Supreme Court of Alaska.

Nov. 5, 1993.

Kenneth C. Kirk, Kirk & Robinson, Anchorage, for appellant.

J. Stefan Otterson, Asst. Atty. Gen., Anchorage, Charles E. Cole, Atty. Gen., Juneau, for appellee.

Roger E. Holl, Anchorage, Guardian Ad Litem.

Before MOORE, C.J., and RABINOWITZ, BURKE, MATTHEWS and COMPTON, JJ.

*OPINION*

MATTHEWS, Justice.

The superior court adjudicated G.T. a child in need of aid (CINA). F.T., G.T.'s father, timely appealed the adjudication.[1] We reverse.

### FACTUAL AND PROCEDURAL BACKGROUND

Gordon, born August 12, 1983, is seriously emotionally disturbed and given to outbursts of rage and verbal and physical attacks.

The Department of Health and Social Services, Division of Family and Youth Services (DFYS) first became involved with Gordon's family in 1985. No child protection issues were substantiated, so the case was closed and no court action was filed. The next DFYS involvement was in February 1989. This involvement was also resolved without court action. By this time, Frank was separated from his wife and Gordon was in the wife's custody. The basis for DFYS involvement was "substantiated child abuse" on Frank's part. The record contains no details about this abuse. The transcript of the adjudication proceedings describes only one event, in which Frank "pushed Gordon into a chair or a bench, something that made him hit his head."

DFYS's next involvement was on the basis of a referral in December 1989, for neglect on the mother's part.

Between 1985 and 1989 Frank's wife obtained five domestic violence restraining orders against him.[2] All began as *ex parte* petitions. Three were never pursued. The other two were extended to 90 and 135 days respectively.

The present case began in May 1990. While Gordon was in his mother's custody, he had been hospitalized in a unit for emotionally disturbed children at Charter North Hospital three times. During the

---

1. In order to preserve the anonymity of the parties, and for the reader's convenience, we will use "Gordon" and "Frank" as placeholders for G.T.'s and F.T.'s names.

2. These orders are not part of the record on appeal before this court.

third hospitalization the hospital staff concluded that it had exhausted its resources and that the situation at the mother's home was continuing to deteriorate. DFYS then filed a petition for emergency custody of Gordon.

Following DFYS's intervention, Gordon was released from the hospital into the care of family friends. Gordon did not do well in his foster home. Growing conflicts led his foster parents to conclude that they could no longer take care of him. Apparently DFYS, the foster parents, and the family's pastor then agreed that "Frank should be given a chance to take Gordon home."

In preparation for this transfer, Frank was instructed to undertake "psychological evaluation, a parenting skills class, and Male Awareness Program, as well as to get a day time job, an apartment large enough for Gordon to have his own bed and space, and a telephone." DFYS acknowledges that Frank was "very cooperative" and made "definite progress" complying with these directives. Among other things, Frank submitted to a psychological evaluation, quit his job and found day-time employment, moved to a larger apartment with room for Gordon, and enrolled in parenting classes.

Pending the transfer to Frank's care, Gordon was moved from his first foster home to a second foster home. Within days Gordon's condition deteriorated to the point that on February 11, 1991, he was hospitalized in Charter North for a fourth time. DFYS then abandoned its plans to place him in Frank's care.

An adjudication hearing was held February 27, 1991. Frank contested the adjudication. DFYS argued against returning Gordon to his father's custody, urging that Gordon was improving in the hospital and needed a stable environment.

Judge Reese adjudicated Gordon to be a child in need of aid under AS 47.10.-010(a)(2)(A) and (C).[3] Judge Reese based his decision in part on the domestic violence orders, of which he took judicial notice. Three months later a disposition hearing was held before Master Brown. The State's earlier, optimistic forecasts notwithstanding, Gordon was still hospitalized in Charter North. Frank asked that Gordon be placed in his custody. DFYS argued for continued hospitalization followed by institutionalization in a "consistent, very structured type of environment." Master Brown adopted DFYS' recommendation. Frank objected to the master's report. Judge Michalski then entered a disposition order placing custody of Gordon in DFYS. This appeal followed.

## DISCUSSION

Frank challenges the superior court's CINA adjudication on several grounds. As a threshold matter, we note Frank's claim that the superior court actually based its

---

3. In pertinent part, AS 47.10.010(a)(2) provides as follows:

   **Sec. 47.10.010. Jurisdiction.** (a) Proceedings relating to a minor under 18 years of age residing or found in the state are governed by this chapter, except as otherwise provided in this chapter, when the court finds the minor

   . . . . .

   (2) to be a child in need of aid as a result of
   (A) the child being habitually absent from home or refusing to accept available care, or having no parent, guardian, custodian, or relative caring or willing to provide care, including physical abandonment by
   (i) both parents,
   (ii) the surviving parent, or
   (iii) one parent if the other parent's rights and responsibilities have been terminated under AS 25.23.180(c) or AS 47.10.080 or voluntarily relinquished;

   (B) the child being in need of medical treatment to cure, alleviate, or prevent substantial physical harm, or in need of treatment for mental harm as evidenced by failure to thrive, severe anxiety, depression, withdrawal, or untoward aggressive behavior or hostility toward others, and the child's parent, guardian, or custodian has knowingly failed to provide the treatment;
   (C) the child having suffered substantial physical harm *or* if there is an imminent and substantial risk that the child will suffer such harm as a result of the actions done by or conditions created by the child's parent, guardian, or custodian or the failure of the parent, guardian, or custodian adequately to supervise the child[.]
   (Emphasis added.)

adjudication on a best-interest analysis instead of the statutorily prescribed bases for assuming jurisdiction. The transcript of the adjudication hearing lends some support to this argument. Both the State and the superior court focused on whether a CINA adjudication would be in Gordon's best interest. The State's witnesses testified to this effect, and the State, the guardian ad litem, and the mother's attorney all presented the case in this light in their closing arguments.

■ Basing a CINA adjudication entirely on a best-interest analysis is reversible error. *Cf. Cooper v. State*, 638 P.2d 174, 180 n. 9 (Alaska 1981). The statutory ground for a CINA adjudication must first be established. In this case, Judge Reese's oral decision on the record made express use of the statutory language in AS 47.10.-010(a)(2)(C). In his written Adjudication of Child in Need of Aid and Interim Order of Disposition, Judge Reese expressly based his CINA adjudication on AS 47.10.-010(a)(2)(A) and (C). On review we must therefore determine whether the evidence presented at the adjudication hearing could have supported a CINA adjudication under either of these grounds.[4]

A. Did the trial court err in concluding that a preponderance of the evidence supported a CINA adjudication under AS 47.10.010(a)(2)(A)?

Applied to the specific facts of this case, AS 47.10.010(a)(2)(A) would support a CINA adjudication only if Gordon had no parent, guardian, custodian, or relative caring or willing to provide care. Specifically, the parties' dispute whether Frank was *willing to provide care.*

The State advances two arguments in support of its contention that Frank was not willing to provide care. It argues that Frank did not "manifest[ ] a willingness to assume immediate care of Gordon." It also argues that Frank could not have been willing to provide care because he was unable to meet Gordon's needs.

■ The State's first argument is without merit. Frank unequivocally expressed his desire to care for Gordon. He also indicated his willingness to leave Gordon in foster care during a transition period in order to minimize disruption in Gordon's routine. The State concludes that Frank was not willing to assume *immediate* care of Gordon. The statute imposes no such requirement, and the State's inference is in any case unreasonable.

■ The State's second argument has no more substance. As the State points out, we have held that. abandonment depends on objective conduct and not on subjective intent. *D.E.D. v. State*, 704 P.2d 774, 783 (Alaska 1985); *E.J.S. v. Department of Health & Social Serv.*, 754 P.2d 749, 751 (Alaska 1988). The State combines this point with the statutory definition of "caring"[5] to reach the conclusion that if a child has needs a parent cannot meet, then the parent cannot be "willing to provide care" for that child.

The State is correct to emphasize the importance of objective conduct. But by any reasonable measure Frank's conduct objectively bespeaks willingness to care for Gordon. In addition, the State's conflation of *willingness to care* and *ability to satisfy needs* leads to absurd conclusions. By the State's logic, the parent of any child with an incurable disease is not willing to care for that child, since by definition the parent will not be able to meet the child's medical need for a cure.

---

**4.** Whether the superior court failed to apply the jurisdictional elements of AS 47.10.010(a)(2) "is a question of statutory interpretation, which this court will decide using its independent judgment adopting the rule of law that is most persuasive in light of precedent, reason, and policy." *In re J.L.F.*, 828 P.2d 166, 168 n. 5 (Alaska 1992). However, the "factual findings supporting the trial court's determination that a minor is a Child in Need of Aid will not be overturned on review unless clearly erroneous." *A.H. v. State*, 779 P.2d 1229, 1231 (Alaska 1989).

**5.** AS 47.10.990(1) defines "caring" as follows:

"[C]are" or "caring" under AS 47.10.010–(a)(2)(A) ... means to provide for the physical, emotional, mental, and social needs of the child[.]

In sum, there is no basis in the record for a CINA adjudication under AS 47.10.-010(a)(2)(A). To the extent that the court's adjudication rests on this subsection, it is clearly erroneous.

B. Did the trial court err in concluding that a preponderance of the evidence supported a CINA adjudication under AS 47.10.010(a)(2)(C)?

Adapted to the facts of this case, AS 47.10.010(a)(2)(C) would support a CINA adjudication only if the court found either that Gordon *has* "suffered substantial physical harm ... *as a result of* the actions done by or the conditions created by" Frank, or that Gordon *will* suffer "substantial physical harm" *as a result of* Frank's actions or inaction.

The superior court made both of these findings. It found that Frank's "conduct and his attitude and the way he deals with things is what has caused a great deal of" Gordon's problems. It also found that "[t]o put Gordon into [Frank's custody] would likely subject Gordon to a very high risk of violence as has been the situation in the family in the past. And imminent and substantial risk for Gordon of physical harm."

**6.** Frank also argues that the State abandoned AS 47.10.010–(a)(2)(C) as a basis for the CINA adjudication. Since we find insufficient evidence in the record to support an adjudication under AS 47.10.010(a)(2)(C), we do not reach this contention.

**7.** By way of illustration, Gordon's last hospitalization occurred after he was placed in a foster home to which Frank had no access. During this placement his contact with Gordon was limited to one weekly meeting; the foster parents did not even allow Frank to call Gordon, because his calls were at inconvenient times. Within two weeks Gordon had to be hospitalized. Gordon's psychiatrist testified that the hospitalization was the result of the "major environmental stress" produced by this change in foster placement.

**8.** The State's claim that Frank never objected to introduction of hearsay evidence of his alleged physical violence is incorrect. As soon as Karamolegos began to present hearsay evidence Frank objected on hearsay grounds. The State responded that it was offering the testimony

■ Frank argues that the record does not support these findings.[6] We agree. There is no evidence in the record to support the claim that Frank's conduct caused Gordon's problems. Indeed, the evidence was to the contrary. Gordon's crises occurred only after Frank left the household. Each of the hospitalizations occurred while he was in his mother's custody or with foster parents.[7] The record provides no support for the court's speculations about the etiology of Gordon's condition.

The superior court's conclusion that Gordon faced "imminent and substantial risk ... of physical harm" if released into Frank's custody calls for more extensive discussion. As Frank notes, the court might have relied on two kinds of evidence in concluding that Gordon would be exposed to "a very high risk of violence as has been the situation in the family in the past." The first is evidence that Frank physically abused his children; the second, evidence that he physically abused his wife.

■ Hearsay evidence that Frank physically abused his children was introduced by Gordon's social worker, Margie Karamolegos, for the sole purpose of providing the basis for her expert opinion as to Gordon's needs. The court explicitly allowed it on that basis.[8] Its use to establish whether Frank abused his children would therefore be improper.[9]

only as the basis for Karamolegos' expert opinion as to Gordon's needs. The court accepted it on that basis.

Frank also appeals the admission of hearsay testimony at the subsequent disposition hearing. Since we reverse the CINA adjudication we do not reach this issue.

**9.** In addition, even if Karamolegos' hearsay testimony were allowed to prove Frank's abuse, it is inadequate to support the court's determination. Karamolegos made clear that Gordon would lead *any* parent to use force on occasion. The record fully confirms this assessment. Gordon's first foster parent acknowledges needing to "restrain" Gordon on occasion, including "[p]hysically sit on him if that was necessary." At first this occurred as often as three or four times a day. Karamolegos described teachers at Gordon's school needing to "control" Gordon, and "upon a number of different occasions" needing to "restrain him" by having "to actually hold him down." His psychiatrist describes similar events.

There was no other testimony that Frank had ever physically abused his son. In fact, although the petition for adjudication alleges physical abuse, the State declined to pursue this in any detail. It chose to present *no direct evidence of any kind* concerning Frank's alleged physical abuse.

The domestic violence restraining orders are therefore the only possible bases for the superior court's finding that Frank's conduct would place Gordon in imminent and substantial risk of substantial physical harm. The petition for adjudication cited these orders. Frank was asked about them during the hearing and gave a rambling response. He denied that the allegations of violence were accurate and invited the State to pursue the matter in more detail.

The State declined to do this. The restraining orders were not entered into evidence and the State presented no direct testimony to support allegations of violence. However, at the conclusion of the hearing the superior court announced that it had reviewed all court records involving Frank. Speaking of the domestic violence restraining orders, the court stated that "we have records that I can take judicial notice of that show his history of violence."

■ On appeal, Frank challenges the superior court's decision to take judicial notice, arguing that the factual allegations judicially noticed were unsuitable for such

The State's own testimony therefore establishes that some degree of physical force is sometimes appropriate in order to cope with Gordon's violent outbursts. The State presented no evidence that the physical force it alleged Frank used on Gordon on three or four occasions was not of this kind.

10. Whether the superior court properly took judicial notice is a question of law. This court may substitute its judgment for that of the superior court. No deference to the court's decision is needed, for "[a]n appellate court is often in as good a position as the trial court to ascertain the degree of probability of a judicially ascertainable fact." 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 201[04], at 201–49 (1992).

11. The State also suggests that any error in taking judicial notice would be harmless, since there was other evidence of violence to support

notice.[10] The State responds that since it is attested to in court documents, Frank's "history of violence" is the kind of fact suitable for judicial notice.[11]

Article II of the Alaska Rules of Evidence governs taking judicial notice. A court may take judicial notice "at any stage of the proceeding," Alaska R.Evid. 203(b), and may do so "whether requested or not," Alaska R.Evid. 201(c). In addition, the Rules leave considerable discretion to the court to take judicial notice of *judicially noticeable facts.* However, they leave no discretion to the court about *which kinds of fact* may be judicially noticed. Alaska R.Evid. 201(b).[12] *See* Alaska Evidence Rules Commentary, Rule 201(c) and (d): "Under subdivision [201](c) the judge has a discretionary authority to take judicial notice, *as long as subdivision [201](b), supra, is satisfied....* The question of whether or not to take judicial notice *of fact that satisfies the conditions of subdivision [201](b)* is thus left primarily to the court's discretion." (Emphasis added.)

■ The question is therefore whether the proposition that Frank had a "history of violence" was a judicially noticeable fact. The rules set out the applicable standard: "A judicially noticed fact must be *one not subject to reasonable dispute.*" Alaska R.Evid. 201(b) (emphasis added). The Commentary to the Alaska Evidence Rules fleshes out this standard as follows:

the adjudication under AS 47.10.010(a)(2)(C). We disagree. As we have noted, the State offered *no* direct evidence of physical abuse on Frank's part.

12. Alaska Rule of Evidence 201 provides, in pertinent part:

(b) **General Rule.** A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within this state or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.

(c) **When Discretionary.** A court may take judicial notice as specified in subdivision (b), whether requested or not.

(d) **When Mandatory.** Upon request of a party, the court shall take judicial notice of each matter specified in subdivision (b) if the requesting party furnishes sufficient information and has given each party notice adequate to enable the party to meet the request.

The court taking judicial notice of a fact as that term is used in Rule 201 is held to a ... demanding standard—the same standard required for it to direct a verdict; it must be right, meaning that rational minds would not dispute the fact that the court notices.

Evidence Rules Commentary, Rule 201(a); *see also* 1 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence*, ¶ 200[01], at 200–2 (1990) (judicial notice of fact "is restricted to discrete facts which are so well known or authoritatively established as to be essentially indisputable."). Applying that standard, as laid out in *Barber v. National Bank of Alaska*, 815 P.2d 857 (Alaska 1991), yields the following: This court will affirm taking judicial notice only if, viewing the evidence in the light most favorable to the party against whom judicial notice is to be taken, fair-minded jurors could not disagree about the truth of the proposition to be noticed.

The State argues that this standard was met in this case because the court derived the judicially noticed proposition that Frank has a "history of violence" from court records. It argues that court records are particularly suited for judicial notice and points out that courts routinely notice such records.

We agree that courts freely take notice of court records, especially their own. However, they typically do so in order to take judicial notice of such facts as that a prior suit was filed, who the parties were, and so forth. These are indeed facts not subject to reasonable dispute.

▆▆▆▆ Courts are far more circumspect about taking judicial notice of the facts alleged in court records. *Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc.*, 969 F.2d 1384, 1388–89 (2d Cir.1992) (judicial notice of another court's factual findings may be used only to establish the fact of litigation and related filings, not the truth of the matters asserted); *Marshall v. Bramer*, 828 F.2d 355, 358 (6th Cir.1987) ("it is generally not appropriate to judicially notice findings of fact made in other cases"); *United States v. Sixty Acres, More or Less with Improvements, Located in Etowah County, Alabama*, 736 F.Supp. 1579, 1581 (N.D.Ala.1990) (courts "cannot judicially know for the purposes of [the present] case evidence received in another case"). We conclude that the trial court erred in taking judicial notice of the restraining orders for the purpose of establishing that Frank had committed acts of violence in the past.[13]

For the above reasons there is insufficient evidence to support the trial court's adjudication under AS 47.10.010(a)(2)(C).

Accordingly, we REVERSE the superior court's adjudication of Gordon as a child in need of aid under AS 47.10.010(a)(2)(A) and (C), and VACATE its order committing Gordon to DFYS's custody.

**13.** The superior court may have meant to invoke the doctrine of issue preclusion; that doctrine is also not applicable to this case. Under the general rule of issue preclusion, an issue of fact which is actually litigated in a former action may, under certain circumstances, be regarded as conclusive in a subsequent case. Restatement (Second) of Judgments § 27 (1982). Whether domestic violence orders issued under AS 25.35.010 or AS 25.35.020 can cause issue preclusion in a subsequent child in need of aid proceeding is a topic of some complexity. It is sufficient for our purposes in this opinion to state that issue preclusion in such cases would by no means be inevitable. The issue as to whether the individual in question had committed acts of domestic violence must have actually been litigated; a judgment entered by default does not qualify as actual litigation. *Id.* § 27 cmt. e. Further, various exceptions to the rule of issue preclusion may apply in this case. *See Id.* §§ 28(3), 28(5), 29(2), 29(5). None of these matters were explored in the trial court and therefore issue preclusion by reason of the domestic violence orders would have been plainly inappropriate.