v.

STATE of Alaska, DEPARTMENT OF HEALTH AND SOCIAL SERVICES, DIVISION OF FAMILY AND YOUTH SERVICES and B.T., Appellees.

In re: R.T., A Minor Under the Age of 18 Years.

No. S–7265.

Supreme Court of Alaska.

Sept. 6, 1996.

Kenneth C. Kirk, Anchorage, for Appellant.

J. Stefan Otterson, Assistant Attorney General, Anchorage, and Bruce M. Botelho, Attorney General, Juneau, for Appellees.

Before COMPTON, C.J., and RABINOWITZ, MATTHEWS and EASTAUGH and FABE, JJ.

## OPINION

FABE, Justice.

## I. INTRODUCTION

The father of a minor child, R.T., challenges the superior court's decision that R.T. remain a child in need of aid (CINA) and the consequent extension of state custody for up to two years. We conclude that the trial court's decision was not clearly erroneous and should be affirmed in all respects.

## II. FACTS AND PROCEEDINGS

### A. Background

F.T. and B.T. separated in February 1989. They had two children: a son, G.T., and a daughter, R.T. R.T. was born in November 1985 and was nine years old at the time of the most recent proceedings in the superior court. The children's mother, B.T., had custody of the children after she and F.T. separated. F.T. was not allowed to have unsupervised visits with the children because of substantiated allegations of child abuse.

In May 1990 the Department of Health and Social Services (DHSS) filed a CINA petition for temporary placement of the children. Superior Court Judge John Reese found probable cause to believe that the children were in need of aid, that reasonable efforts were made to prevent their removal from the home, and that continued placement in the home would not be in their welfare.

In February 1991 Judge Reese found that G.T. and R.T. were children in need of aid. F.T. appealed the child in need of aid adjudication of G.T. F.T. did not appeal the determination that R.T. was a child in need of aid.

We concluded that there was no basis in the record to support a finding that G.T. was in need of aid under AS 47.10.010(a)(2)(A), and insufficient evidence to support a finding under AS 47.010(a)(2)(C). *F.T. v. State,* 862 P.2d 857, 862, 864 (Alaska 1993). We vacated the order committing G.T. to the custody of DHSS, and G.T. was subsequently returned to F.T.

### B. Proceedings before Judge Gonzalez

In October 1993 DHSS filed a petition to terminate F.T.'s parental rights with respect to R.T.[1] Superior Court Judge Rene J. Gonzalez held a termination trial in August 1994. Social worker Marge Karamolegos testified that she was assigned to R.T.'s case on July 20, 1990 and that during the time she worked on the case there was no plan to reunite R.T. and F.T. Larry Overholser took over for Karamolegos in November 1992. He testified that there was no reunification plan. However, before the close of evidence, the State recalled Overholser, and he testified that a more complete review of the file revealed two reunification plans, dated December 1990 and June 1991.

Judge Gonzalez found that R.T. was "exposed to domestic violence between her parents." He also found that R.T.'s foster parents had done an excellent job with her and that her foster parents wished to adopt her.

As to reunification, Judge Gonzalez found that although there were apparently two reunification plans in DHSS's files,

> the evidence is clear that DHSS did not implement these plans because (1) their focus was on [R.T.] eventually being placed up for adoption, and (2) in practice, no plan to reunify [R.T.] with her father existed. DHSS exerted minimal effort in trying to work with [F.T.] in a treatment plan he could reasonably follow to eventually reunite with his daughter [R.T.].

He found that there had been continuing difficulties between social workers and F.T. and that F.T. "had encountered repeated difficulties in obtaining reasonable visitation with his daughter." Judge Gonzalez also noted that social workers had found F.T.

---

1. B.T., R.T.'s mother, consented to having R.T. adopted by her foster parents.

difficult to work with because of his short temper and low frustration threshold.

Judge Gonzalez noted that R.T. had been diagnosed by a psychologist as suffering from "major depression." Given that diagnosis, he noted that "it is troubling that DHSS did not have [R.T.] psychologically evaluated at a much earlier date so that she could have been receiving the professional attention she needs much earlier."

Judge Gonzalez concluded that under Alaska Child in Need of Aid Rule 15(g), DHSS must make a reasonable effort to reunify a child in its custody with the child's family. He ruled that DHSS had not made reasonable efforts, opining:

> The two social workers who had the direct responsibility to assist [F.T.] with a reunification plan were not even sure that such a plan existed. While it is true that a search of the case file eventually revealed documentation of a plan, the actual efforts made by DHSS to work with [F.T.] were not reasonable efforts to return [R.T.] to his home.

Judge Gonzalez concluded that he could not make a finding that F.T.'s conduct, which originally caused R.T. to be a child in need of aid, was likely to continue given the absence of a reasonable reunification plan. He denied the State's petition to terminate F.T.'s parental rights. Judge Gonzalez also ordered DHSS to make reasonable efforts to reunite F.T. and R.T. and to work with F.T. on visitation and counseling.

### C. Proceedings before Judge Reese

In March 1995 F.T. filed a petition alleging that the Division of Family and Youth Services (DFYS), a division of DHSS, was refusing him visitation in violation of Judge Gonzalez's order. DFYS opposed the petition and filed a petition to extend custody for another two years. The State's petition argued that F.T. should complete one-on-one parenting classes, attend counseling, and address anger management through individual or group counseling prior to visitation. The State also alleged that R.T.'s psychologist had diagnosed her as suffering from post-traumatic stress disorder and that visitation with F.T. would seriously interfere with her academic and daily functioning. F.T. opposed the State's motion to continue custody.

Judge Reese conducted the trial on May 2, 1995. F.T. argued that the two-year extension was not in R.T.'s best interests and claimed that R.T. was no longer a child in need of aid. He proposed that a transitional schedule be put in place to return R.T. to his care.

The court received testimony from two therapists, social worker Larry Overholser, F.T., and R.T.'s mother, B.T. This included extensive testimony as to R.T.'s unwillingness to accept the care of her father, past alleged incidents of child abuse and domestic violence, and F.T.'s behavior at supervised visits with R.T. F.T. also testified at length about what he would do if R.T. were returned to his care. He also provided testimony about how he felt G.T. was doing under his care.

The court found that R.T. continued to be a child in need of aid on the basis that she was refusing to accept F.T.'s care. The court also noted in its oral order that R.T. could be found a child in need of aid based on the threat of physical harm if she were returned to F.T.'s care. The court added in its written order that F.T. had failed to complete treatment "necessary to address anger management and to be able to respond adequately to the needs of [R.T.]." The court concluded that continued CINA jurisdiction was in R.T.'s best interests.

Judge Reese also ruled that the State could not leave the decision about commencing visitation up to R.T.'s therapist. He told the State that it would have to be ultimately responsible for such decisions. The court approved the State's treatment plan for F.T. R.T. was left in the care of the State. F.T. appeals.

### III. DISCUSSION

#### A. Standard of Review

■ The superior court's factual findings will not be overturned unless they were clearly erroneous. A.H. v. State, 779 P.2d 1229, 1231 (Alaska 1989). A finding is clearly erroneous when we are left with the defi-

nite and firm conviction after reviewing the entire record that a mistake has been made. *In re J.L.F.*, 828 P.2d 166, 170 n. 12 (Alaska 1992), *overruled on other grounds, In re S.A.*, 912 P.2d 1235, 1241 (Alaska 1996).

■ As to the interpretation of statutes and other issues of law, we apply our independent judgment. *In re J.L.F.*, 828 P.2d at 168 n. 5.

B. *Did the Trial Court Correctly Conclude that R.T. Is a Child in Need of Aid?*

■ Both AS 47.10.083 and CINA Rule 19 require the court to determine that a child continues to be in need of aid before it grants an extension of custody. *See* AS 47.10.083; CINA Rule 19(f); *see also* 1990 Senate Journal 3431.[2] In this case, the trial court correctly concluded that R.T. continued to be a child in need of aid.

Under AS 47.10.010(a)(2)(A) a child can be found to be a child in need of aid as a result of

> the child being habitually absent from home or refusing to accept available care, or having no parent, guardian, custodian, or relative caring or willing to provide care, including physical abandonment....

Judge Reese found that R.T. was "refusing care available by her father apparently in a very loud manner," and this formed the primary basis for his finding that R.T. was a child in need of aid. The State, B.T., and the Guardian Ad Litem all agree that it was correct for the trial court to adjudge R.T. a child in need of aid on this basis. F.T. argues that R.T. has not had the opportunity to actually accept or reject his care.

The superior court had before it a great deal of evidence concerning R.T.'s refusal to accept F.T.'s care. This evidence came primarily from the testimony of therapists who examined or worked with R.T. Their opinions related the substance of R.T.'s refusal to accept care from their father. As Dr. Senzig testified, it "seem[ed] highly unlikely" that R.T. "would accept [F.T.] as her full-time caregiver" at the time of trial. They also discussed R.T.'s reasons for refusal and their judgment that R.T. was basing her concerns on actual events. For example, the court had the following exchange with Dr. Senzig:

Q You said that [R.T.] can give you accurate and vivid detail about the reasons why she doesn't want to visit. What are those reasons?

A She talks about watching her parents engaged in arguments and fights, and trying to shut out the noise of the fights by covering her ears and not being able to do that, and saying that after hearing fights like that, she has—she can't get the angry words and voices out of her head, and they keep going on and on and on. She tries to distract herself by engaging in various play activities and still can't get the words out of her head.

Q Anything else?

A She describes a visit at DFYS where her father was, as she puts it, yelling and it being very scary, and she's trying to shrink out of the way, and hoping that there wouldn't be a physical fight like she had seen [F.T.] and [B.T.] do in the past. She talked once about sitting somewhere between her parents and having them argue over her, and scrunching down, and talking about how it feels to have two grownups yelling over your head. And says, you know, I feel like getting up and standing in front of them and screaming, you're acting like children, stop it, but I don't do that because that would be rude and that would be disrespectful.

Q Anything—any other things that happened at the visits that were seen by her as particularly stressful?

A She described once that Mr. Overholser had to ask her father to leave because he was yelling so much, and stated that she was glad because she's tired of hearing all that yelling. She described her father asking her, as she puts it, dumb questions. And asking her the same question over and over, and has com-

---

**2.** Prior to the 1990 amendment to AS 47.10.083, under our decision in *In re A.S.*, 740 P.2d 432, 434–436 (Alaska 1987), the only relevant question upon a petition to extend the State's custody of a child in need of aid was whether such an extension was in the best interests of the child.

mented he doesn't—he doesn't listen to what I say.

B.T. also testified. She had recently taken R.T. to lunch and claimed that when she mentioned the possibility of living with F.T. to R.T., "[w]e had to calm her down and we had to change the conversation and calm her down."

R.T.'s social worker, Larry Overholser, also testified. His testimony about F.T.'s behavior during visits with R.T. would also lend credibility to R.T.'s claim that she would not accept F.T.'s care. For example, Overholser testified:

> I talked to [R.T.] after that visit and spent some time talking to her and—and talking to the foster parent. [R.T.] was very upset. She was—she was visibly shaken, and the foster parent was a little bit fearful too. But [R.T.] was very visibly upset and visibly shaken and scared. At that time I—I told [R.T.] that—that she had some say in the visit. That—that—I also told her that I was not going to force her to visit [F.T.] under those conditions.

Overholser testified about subsequent conversations that he had with R.T. on the issue of visitation with F.T.:

> A  I went out to the house and talked to [R.T.]. And [R.T.] told me that she was—she was afraid of [F.T.] and she didn't want to visit him any more. His behavior had scared her and—and she thought he was unpredictable. She didn't know what he would do, and she said she didn't want to visit him at that time. I—I gave some assurance that she had some—some say in the visit.
>
> . . . .
>
> Q  All right. Were there any visitations after that time?
>
> A  Since that time [R.T.] has pretty consistently refused to visit with [F.T.]. And I've talked to her. We saw the results of the psychological which came out, taken those into consideration, referred her to counseling to Dr. Karen Senzig who basically kind of confirmed some of the stuff that we were seeing. And after that point we had had requests for visitation but [R.T.] at that point was pretty

strongly, pretty consistently, and in my—my opinion, justifiably, refusing to visit with him. So, I agreed not to force her to visit with him. I didn't feel like it was in her best interests to do that.

Additionally, there was testimony that R.T. witnessed F.T. committing acts of domestic violence. B.T. testified that when they were together, F.T. threw a plate of spaghetti at her while R.T. crouched between her legs. She also testified that at a time when R.T. was in the home, F.T. knocked her into the wall and then "[h]e hit me in the face, broke my nose, and broke my shoulder blade as I laid on the floor."

Given all of this evidence, it was not clearly erroneous for the court to conclude that R.T. refused to accept F.T.'s care, rendering her a child in need of aid.

### C.  Did the Court Implicitly Overrule Judge Gonzalez's Order?

F.T. claims that Judge Reese's order was inconsistent with Judge Gonzalez's order. F.T. argues that Judge Gonzalez found that no reasonable efforts had been made to encourage visitation. On the other hand, Judge Reese seems to have implicitly found that reasonable efforts had been made to encourage visitation. This is the only inconsistency to which F.T. points.

There was no inconsistency between the orders because Judge Reese's order can be read to reflect the State's efforts at promoting visitation in the wake of Judge Gonzalez's order. Judge Reese's order was not inconsistent with Judge Gonzalez's order.

### D.  Did the Court Err by Failing to Enter a Specific Visitation Schedule?

Finally, F.T. argues that Judge Reese refused to enforce Judge Gonzalez's order that DFYS work towards reunification of R.T. with F.T. He claims that the superior court was required to find that the State had shown by clear and convincing evidence that termination of visitation was in the child's best interests. He argues that the State failed to meet this burden of proof. F.T. asks this court to remand this case with instructions that the trial court establish a

specific visitation schedule, which should include "unsupervised visits, overnights, and extended visits during school holidays."

In response, the State points out that there are two different burdens of proof in visitation cases. When reasonable visitation is actually or constructively terminated, the clear and convincing evidence standard applies. *In re D.P.*, 861 P.2d 1166, 1167 (Alaska 1993); *D.H.*, 723 P.2d at 1277. However, when "a parent's reasonable visitation rights are merely restricted," the burden is to prove that the restriction is in the child's best interests by a preponderance of the evidence. *In re D.P.*, 861 P.2d at 1167; *In re A.B.*, 791 P.2d 615, 618 (Alaska 1990). The State argues that it has not denied visitation but merely placed reasonable restrictions on visitation to protect R.T.

■ Because F.T.'s right to visitation has been completely denied until he makes progress on his treatment plan, the clear and convincing standard applies. *See D.H.*, 723 P.2d at 1276 (allowing foster parents to take child to Alabama had functional effect of terminating visitation rights of indigent parent).

At trial, social worker Larry Overholser testified that within one week of Judge Gonzalez's order, Overholser contacted F.T. to discuss a reunification plan. He asked F.T. to come to his office to discuss reunification. The plan included F.T.'s participation in individual counseling, one-on-one parenting classes, and anger management training. Overholser claimed that F.T. was "ambivalent" about participating. Overholser contacted F.T. a week later and was told he was still thinking about it. Overholser testified that he was not aware that F.T. had taken any steps to comply with the treatment plan since Judge Gonzalez's order in March of that year. Overholser stated that he would allow visitation as soon as the counselor approved it.

Judge Reese found that F.T. is "severely disturbed, and has acted inappropriately during visits." He acknowledged F.T.'s rights to reasonable visitation but stated that the State could defer visitation until F.T. "made adequate progress on the treatment plan, and visitation would not be damaging to the child."

■ The trial court's decision is supported by clear and convincing evidence and is not clearly erroneous. There was a daunting compilation of evidence that visitation with F.T. at this point would seriously harm R.T. There was also significant evidence that F.T. is in need of anger management and parenting skills training. In light of this evidence, it was clearly in R.T.'s best interests to suspend visitation until F.T. begins making progress on the treatment plan. *See K.T.E. v. State*, 689 P.2d 472, 477–78 (Alaska 1984) (finding that banning visitation did not violate parent's right to reasonable visitation when there was testimony that visits were harming child); *cf. In re D.P.*, 861 P.2d at 1167 (vacating order limiting visitation to two per year because state presented no evidence that limitation was in child's best interest); *In re A.B.*, 791 P.2d at 617–18 (affirming trial court decision that state had failed to prove that limiting visitation to one clinical visit per week was in child's best interests where evidence showed that child's condition had stabilized during same time that more extensive visitation had been allowed).

■ F.T. has raised the concern that R.T.'s therapist will never agree to allow visitation.[3] However, the court ruled that DFYS will have to make the decision on visitation and that it cannot delegate that decision to a counselor. Because F.T. has not taken the necessary steps to follow through on his treatment plan, it is premature for him to complain that the State is likely to withhold visitation in an unreasonable manner.[4]

3. For example, on the question of how soon visitation might be advisable, Dr. Senzig testified: I can't say about the near future because it would depend on what [F.T.] was doing in counseling. If after consulting with his therapist, there was reason to believe that he was making progress and had more ability to focus on [R.T.'s] needs, at that point I think visitations might be possible.

4. F.T. also argues that Judge Reese erroneously failed to consider and misconstrued evidence of how G.T. was doing under his care. F.T. presented testimony that G.T. is doing much better

## IV. CONCLUSION

We conclude that the superior court's decision was correct in all respects. Once F.T. has commenced the treatment plan, he can petition the court if he believes that the State has unreasonably withheld visitation. The decision of the superior court is AFFIRMED.

in his care. However, Judge Reese stated in his oral disposition that:

> I hoped to hear more about [F.T.]'s success with [G.T.]. There was in the end almost no information about [G.T.]. Listening to the other testimony, I am quite concerned about [G.T.].

In this regard, F.T. himself testified that he took G.T. off his medications despite explicit warnings from G.T.'s psychiatrist. Additionally, it does not seem that G.T. is receiving any professional counseling. The trial court also received testimony that G.T. had been asked not to return for visits with friends at Alaska Baptist Home because G.T. was too disruptive. There was also evidence that G.T. is doing better; F.T. testified that he no longer has to be restrained and is doing better in school. Larry Overholser was also apparently told by a teacher that G.T. was doing better in school. Given the mixed nature of the testimony regarding G.T. and the fact that R.T. was refusing to return to F.T.'s care, the trial court's decision was not erroneous.