**In the Matter of B. J., a minor.**
**No. 2161.**

Supreme Court of Alaska.
Jan. 20, 1975.

William Bryson, Asst. Public Defender, Herbert D. Soll, Public Defender, Anchorage, for appellant.

Timothy G. Middleton, Asst. Atty. Gen., Anchorage, Norman C. Gorsuch, Atty. Gen., Juneau, for State of Alaska.

John W. Wood, Anchorage, as appellee guardian ad litem.

Before RABINOWITZ, C. J., and CONNOR, ERWIN, BOOCHEVER and FITZGERALD, JJ.

## OPINION

BOOCHEVER, Justice.

This is an appeal from the superior court judge's decision to terminate the parental rights of Mr. J. with regard to his natural daughter, B. J. Specifically, Mr. J. alleges that there was insufficient evidence before the trial court to support a finding of abandonment as required by AS 47.10.-080(c)(3)(B).[1]

Mr. J. is the natural father of B. J., who was born November 12, 1962. He has

---

1. AS 47.10.080(c)(3)(B) provides:
 (c) If the court finds that the minor is dependent, it shall

 . . . . .

 (3) by order, terminate parental rights and responsibilities of one or both parents and commit the child to the department or to a legally appointed guardian of the person of the child, if one of the following conditions exists:

 . . . . .

 (B) the child has been abandoned for a period of not less than six months by
 (i) both parents, or
 (ii) the surviving parent, or
 (iii) one parent if the other has been deprived of custody and visitation rights;

 . . . . .

 There is no question as to B.J.'s dependency at the time of the hearing.

lived since 1954 in Cordova where he has worked as a shipwright when such work was available. Although Mr. J. in recent years has suffered from recurrent circulatory and heart conditions as well as a back ailment, he is at most times physically capable of doing this work. In January 1965, B. J. and three other older children of Mr. J. were placed in the custody of the state. In that same year, foster parents were selected for the four children. B. J. and two of the other children continue to reside in the home of the foster parents. B. J.'s mother died in 1965.

The foster parents brought an action in February 1972 for termination of Mr. J.'s parental rights and for adoption of B. J. Mr. J. opposed the action. The result was a stipulation entered into by the natural father, the state and the foster parents regarding what the natural father would have to do to reassume his parental role. On March 14, 1972, a plan was drawn up which referred Mr. J. to various individuals whom he could contact in order to receive assistance in this process. Through the plan thus created, Mr. J. was to obtain assistance in finding suitable housing and suitable employment. Also, he was to be provided financial assistance, homemaker assistance and psychological counseling for himself and his children. Unfortunately, Mr. J. never really took advantage of this plan.

In June 1973, a petition was filed by the State Department of Health and Social Services for the termination of Mr. J.'s parental rights with regard to B. J. The petition was prompted in part by the foster parent's adoption suit.

After an extended hearing at which Mr. J., his oldest daughter, the foster father, and representatives of the State Office of Vocational Rehabilitation and Department of Health and Social Services appeared as witnesses, Judge Hanson found that the fa-

ther had abandoned B. J. His parental rights were terminated, and B. J. was committed to the State of Alaska Department of Health and Social Services for adoption. From that decision, the father has appealed contending that there was insufficient evidence of abandonment to support the superior court's order terminating the father's parental rights and responsibilities to B. J.

We have had recent occasion to discuss the tests to be applied with reference to the issue of abandonment in In the Matter of D. M. v. State[2] and In the Matter of the Adoption of A. J. N.,[3] which were followed in our opinion In the Matter of the Adoption of V. M. C.[4]

The facts in D. M. were quite similar to those confronting us, and were summarized in the opinion as follows:

> D. M.'s mother has not seen D. M. since 1965, nor has she corresponded with or visited him. Her only contact has been to send Christmas presents on two occasions to him through the Welfare office. The mother was informed of her right to visit D. M., but has never exercised that right, apparently because of her ignorance of the necessary procedures, or lack of funds for traveling, and possibly, as alleged by her, official footdragging. She has however made frequent inquiries to Department employees about her son's well-being, and asserted that she hoped one day to regain custody of D. M. The mother has now remarried and has three more children by her present husband. Since 1967, she has reduced her drinking to some extent, and she has not been jailed since that time.[5]

In holding that the evidence supported the decision of the trial court that the mother's parental rights should be terminated by adoption, we stated:

> . . . Her failure to communicate with or to visit D. M. since 1965, her

---

2. 515 P.2d 1234 (Alaska 1973).

3. 525 P.2d 520 (Alaska 1974).

4. 528 P.2d 788 (Alaska 1974).

5. 515 P.2d at 1235–1236.

failure to support the child in any way either emotionally or financially, together with the long term commitment of D. M. to a foster home convinces us that the child has been abandoned. We take into consideration as well the finding of the trial judge that it was in D. M.'s own interest that appellant's parental rights be severed. . . .

Whether or not there has been an abandonment within the meaning of the statute is to be determined objectively, taking into account not only the verbal expressions of the natural parents but their conduct as parents as well. The subjective intent standard often focuses too much attention on the parent's wishful thoughts and hopes for the child and too little on the more important element of how well the parents have discharged their parental responsibility. We acknowledge that parental rights are of serious and substantial import. We note, however, that in recent years the courts have become increasingly aware of the rights of children.[6]

 We defined abandonment as consisting of conduct on the part of the parent which implies a conscious disregard of the obligations owed by a parent to the child, leading to the destruction of the parent-child relationship,[7] and held that it was not error for the trial court to consider the child's best interest in determining the issue of abandonment.[8]

In *A. J. N.*, we had occasion to expand on the requirements for abandonment. The natural father in that case was awarded visitation rights after a divorce, but was frustrated in exercising those rights by actions of the mother who had remarried. He sought the aid of the court, and, when relieved by a court order from support obligations, voluntarily established a trust fund for his daughter and made regular payments into it. The mother moved with the child from Pennsylvania to Oregon, where the natural father successfully opposed an adoption. The mother then took the child to Alaska. We found that the father had not abandoned his daughter,[9] explaining our holding in *D. M.* as follows:

. . . [A]n abandonment finding cannot be predicated solely on the best interests of the child. In *D. M.* we stated that the test for abandonment is whether there is "conduct on the part of the parent which implies a conscious disregard of the obligations owed by a parent to the child, leading to the destruction of the parent-child relationship." The test focuses on two questions—has the parent's conduct evidenced a disregard for his parental obligations, and has that disregard led to the destruction of the parent-child relationship? The best interests of the child are relevant to the latter question, because it is indicative of a breakdown of the parent-child relationship if the child's best interests are promoted by legal severance of the relation. But the child's best interests may not always be directly relevant to the question of the parent's disregard of his obligations. This part of the test can only be satisfied by proof that the parent's conduct evidences a conscious disregard of his obligations. R. N.'s conduct with respect to his daughter does not evidence a disregard of his parental obligations. He has consistently sought to enjoy his visitation rights only to be frustrated by the obstructions placed in his way by R. T. He has established a trust account for his daughter's benefit.

---

6. *Id.* c. 1236–1237 (footnote omitted).

7. *Id.* 515 P.2d at 1237.

8. *Id.* 515 P.2d at 1238.

9. Similarly, in *V.M.C.*, a finding that the father had not abandoned his daughter was upheld on the basis of objective evidence that the conduct of the parent did not imply a conscious disregard of the obligations owed to the child leading to the destruction of the parent-child relationship.

His inability to establish a close relationship with his daughter is not of his doing or choice, but in spite of his wishes. To hold that R. N.'s conduct constituted an abandonment would be totally unfair and could only serve to encourage the obstruction of court-ordered visitation rights.[10]

Applying the criteria of *D. M.* and *A. J. N.* to the present case, we hold that the trial court did not err in finding abandonment and terminating the parental rights. As in *D. M.*, the daughter has been cared for exclusively by foster parents for most of her life, eight of eleven years at the time of the trial. The father during all that time was unable to acquire a suitable home for his children or to show that he was able to care for them. In fact, at the hearing, he admitted that he still was not in a position to care for his children. There was sufficient evidence presented to justify the court's finding of a conscious disregard of the obligations owed by a parent to a child, leading to the destruction of the parent-child relationship. Although required to pay but $5.00 a month towards the support of each of his children, the father failed in that token requirement. He had not visited his children for more than a year until just prior to the hearing of November 20–21, 1973. The children had been taken by the foster father to visit Mr. J. when he was hospitalized in Anchorage in August 1972. Even that visit, however, appears to have been instigated by the representative of the Department of Health and Social Services rather than the father. On a visit to Anchorage in April 1973, the father made no effort to contact his children. His only correspondence for more than a year was a birthday card and one letter to his oldest daughter.

Moreover, he rejected the offer by the state vocational rehabilitation counselor of an expense-paid trip to Anchorage for the purpose of attending a rehabilitation workshop for evaluation aimed at securing permanent employment for him. He also, without giving any plausible explanation, refused to apply for a position as maintenance man at the Cordova Hospital. The position was apparently within his capabilities and might well have led to a stable existence permitting the return of his children. Likewise, he refused to apply for Aid to the Disabled.

There is thus ample evidentiary support for findings that, in general, most of the persons and agencies involved in the plan designed to enable Mr. J. to reassume custody of his children made a genuine effort to implement it with the notable exception of Mr. J.,[11] and that his inability to provide a home for his children and to maintain a parental relationship with B. J. was attributable to a conscious disregard of his obligations.[12]

When looking at the other focus of *D. M.*, that is, the destruction of the parent-child relationship, it is apparent that B. J. has, in effect, known no other parents than her foster mother and father. She called them "Mom" and "Dad", and the testimony indicated her desire to live with them as their daughter. Considering the best interests of the child as related to the destruc-

---

10. 525 P.2d at 523 (footnote omitted). *See also* In the Matter of V.M.C., a Minor, 528 P.2d 788 (Alaska 1974).

11. In fairness to Mr. J., it must be acknowledged that he did make some minimal contacts with agency representatives. As indicated from the summary of incidents referred to in this opinion, however, when concrete opportunities were presented to him, he either neglected to take advantage of them or rejected them outright.

12. Counsel contends that the abandonment must be willful. We equate that requirement with "conscious disregard of parental obligations", and agree that it excludes acts which are beyond the control of the parent and which are not his fault. S. K. L. v. Smith, 480 S.W.2d 119, 124 (Mo.Ct.App. 1972). While Mr. J. has health problems, the finding of the trial court of conscious disregard, as opposed to acts beyond his control, is supported by the evidence.

tion of the parent-child relationship, the evidence is overwhelming that it lies in the termination of the parental relationship with the natural father, thus permitting adoption by the foster parents.

We therefore affirm the order of the superior court.

Affirmed.