In the Matter of J.L.F. and K.W.F.

K.F., Appellant,

v.

STATE of Alaska, and F.C., Appellees.

No. S–4091.

Supreme Court of Alaska.

March 13, 1992.

---

Margi Mock, Asst. Public Defender, John B. Salemi, Public Defender, Anchorage, for appellant.

Dianne Olsen, Asst. Atty. Gen., Anchorage, Charles E. Cole, Atty. Gen., Juneau, for appellees.

Barbara L. Malchick, Deputy Public Advocate, Anchorage, Guardian Ad Litem.

Before RABINOWITZ, C.J., and BURKE, MATTHEWS, COMPTON and MOORE, JJ.

## OPINION

RABINOWITZ, Chief Justice.

K.F. is a twenty-six year old mother of two young boys, J.L.F., born September 1987, and K.W.F., born November 1988. Applying a clear and convincing evidence standard, the superior court both adjudicated the children as children in need of aid (CINA) and found that K.F. was unable to care for the children. Consequently, upon petition by the state, the superior court terminated her parental rights.[1] K.F. appeals both the CINA finding and the termination of her parental rights.

## I. FACTS AND PROCEEDINGS

In late 1988, K.F. and her children were living in a shelter in Anchorage. On December 6, 1988, a worker from the shelter informed the Department of Health and Social Services (DHSS) that K.F. was not taking proper care of her children.[2] DHSS took emergency custody of the children and immediately filed a petition to adjudicate the children as CINA. On December 8, 1988, the superior court found that "[p]robable cause exists to believe that [J.L.F. and K.W.F.] are ... children in need of aid." Therefore, the court ordered "[t]hat [J.L.F. and K.W.F.] are committed to the temporary custody of [DHSS]." The court also ordered a psychological evaluation of K.F., and that K.F. participate in a treatment plan and parenting classes. At a hearing in May 1989, K.F. stipulated that J.L.F. and K.W.F. were children in need of aid. Thereafter the superior court formally made the CINA adjudication and ordered that DHSS continue custody for a period of not more than two years.

The superior court based its May 1989 finding on the fact that "[t]he mother admits that she was unable to provide adequate care for the children at the time custody was assumed in December 1988" and that "completion of a treatment plan is necessary before reunification may be considered." The court found that DHSS's proposed treatment plan, consisting of weekly training of K.F. by homemaker services, weekly participation by J.L.F. and K.W.F. in infant learning services, and counseling of K.F. by Anchorage Center for Families, was in the best interest of the children.

DHSS and K.F. pursued the treatment plan. However, on January 31, 1990, DHSS petitioned the superior court to terminate K.F.'s parental rights, concluding that "despite the intensive intervention efforts," K.F. "would not ever be likely to

---

1. The superior court also terminated the parental rights of the father. The father has not appealed.

2. According to the amended petition for adjudication of CINA and temporary placement, workers and residents at the shelter reported the following incidents to DHSS:

    [K.F. threw J.L.F.] into his crib, cover[ed] his mouth with her hand, and yell[ed] at him to shut up because he was crying. When he did not stop crying, the mother picked up [J.L.F.] by the leg, and started shaking, shook him some more when he did not stop.

    [K.F.] lift[ed] [K.W.F.] up to head level and slam[med] him onto a couch.... [K.F. made] a statement that she wished she allowed her older boy [to] smother [K.W.F.] to death.

develop adequate parenting skills to parent her children."

After trial the superior court concluded that J.L.F. and K.W.F. were "shown to be a child in need of aid pursuant to AS 47.10.010(a)(2)(A) by clear and convincing evidence that [K.F.] is unable to care for them."[3] The superior court further found by clear and convincing evidence that "the parental conduct which caused the minors named above to be children in need of aid is likely to continue." Accordingly, the superior court ordered the "parental rights and responsibilities of [K.F.] ... terminated under AS 47.10.080(c)(3)" and that the children be "committed to the custody of the Department of Health and Social Services for adoptive purposes under AS 47.10.080(d)."

In this appeal, K.F. raises the following issues:

1. Did the Superior Court err in concluding that the minors were children in need of aid under AS 47.10.010(a)(2)(A) because no parent or relative was able to care for the children when, in fact, both the mother's sister and aunt were available to provide care?[4]

2. Did the Superior Court err in finding that the Department of Health and Social Services had established by clear and convincing evidence that the developmentally disabled mother would not be able to care for the children in the future if adequate services were provided?

## II. DISCUSSION

A. *Did the superior court have jurisdiction to make the CINA determination under AS 47.10.010(a)(2)(A) when the state had not proved an absence of relatives willing and able to care for the children?*[5]

Alaska Statute 47.10.010 provides in part,

**Jurisdiction.** (a) Proceedings relating to a minor under 18 years of age residing or found in the state are governed by this chapter, except as otherwise provided in this chapter, when the court finds the minor

. . . . .

(2) to be a child in need of aid as a result of

(A) the child being habitually absent from home or refusing to accept available care, or having no parent, guardian, custodian, or relative caring or willing to

---

3. In support of this conclusion, the superior court entered the following findings of fact:

a. [K.F.] has cognitive difficulties and a personality disorder which create the potential that the children will be in jeopardy if left in her care.

b. Because of [K.F.'s] developmental delays, it is difficult for her to learn and retain information.

c. [K.F.] has been unable to retain information about how to keep her children safe when in her care.

d. The minors are active children with special needs because of their developmental delays. They require good parenting skills which their mother is unable to provide.

e. [K.F.] has been unable and will be unable to provide care for her children without a third party assisting her to care for the children during all waking hours.

f. Expert witnesses testified that [K.F.] could not care for her children absent substantial assistance. Dee Foster testified that [K.F.] would need assistance during most of the waking hours; Dr. Gideon's report indicated [K.F.'s] abilities were marginally sufficient only if with particular assistance; Dr. Richard Lazur testified that [K.F.] could care for her children only if they were all in residential placement with a third party assisting [K.F.] to care for the children.

g. Despite the fact that [K.F.] complied with the treatment plan by attending all appointments made for her for parenting classes and individual therapy and by cooperating with homemakers and public health nurses who went to her home, she made only marginal improvements in her parenting skills. At the completion of all treatment provided, she still was unable to safely care for her children.

4. This issue was not included in K.F.'s original statement of points on appeal. However, this court allowed K.F. to supplement the record, by its order of July 11, 1991.

5. K.F. asserts that the court failed to apply a jurisdictional element of AS 47.10.010(a)(2)(A). This is a question of statutory interpretation, which this court will decide using its independent judgment adopting the rule of law that is most persuasive in light of precedent, reason, and policy. *Langdon v. Champion*, 745 P.2d 1371, 1372 n. 2 (Alaska 1987) (citations omitted).

provide care, including physical abandonment by

    (i) both parents

    (ii) the surviving parent, or

    (iii) one parent if the other parent's rights and responsibilities have been terminated under AS 25.23.180(c) or AS 47.-10.080 or voluntarily relinquished;

.    .    .   . .    .

    (C) the child having suffered substantial physical harm or if there is an imminent and substantial risk that the child will suffer such harm as a result of the actions done by or conditions created by the child's parent, guardian, or custodian or the failure of the parent, guardian, or custodian adequately to supervise the child. . . . [6]

In the case at bar, DHSS petitioned the superior court for a CINA adjudication under both subsections (A) and (C) of AS 47.10.010(a)(2). However, in its final determination, the superior court explicitly relied upon only AS 47.10.010(a)(2)(A) as the basis for its CINA adjudication. Similarly, in its May 1989 CINA adjudication and its initial emergency CINA order the superior court referenced only to subsection (2)(A).[7]

While conceding that she is unable to care for the children, K.F. argues on appeal that the state had a burden under subsection (2)(A) of proving by clear and convincing evidence that no relative was available to care for her children. Only then could the state proceed to the next step in the termination of K.F.'s parental rights under AS 47.10.080(c)(3).[8] K.F. notes that the state presented no evidence relevant to the question of the availability of relatives willing to provide care for the minor children. She, on the other hand, had presented evidence, in conjunction with a motion for continuance, that both her sister and her aunt were interested in assuming custody of the children. Accordingly, K.F. concludes that the superior court had no jurisdiction to adjudicate her children as children in need of aid under subsection (2)(A).

The state argues that under AS 47.10.-080(c)(3), which authorizes termination of parental rights, the focus is on parental conduct. The state believes that a showing of the parent's "inability to care" is sufficient to provide jurisdiction under subsection (2)(A). The state quotes the statutory definition of "caring" as "provid[ing] for the physical, emotional, mental, and social needs of the child." AS 47.10.990(1). Thus, the state concludes that inability of the parent to care for the child provides jurisdiction under subsection (2)(A). The state notes that the other subsections of AS 47.10.010(a)(2) all provide jurisdiction based exclusively on parental conduct, without regard to the availability of relatives who are caring for or willing to provide care. The state argues that availability of relatives only applies to abandonment, and not to the parent's inability to care. Because K.F. is unable to provide care, as defined by statute, the state concludes that the superior court had jurisdiction, and that the availability of relatives is irrelevant in the instant case.

We think the state's argument ignores the plain language of the statute. *See State v. Alex,* 646 P.2d 203, 208 n. 4 (Alaska 1982) (under our sliding scale approach

---

**6.** Subsections B, D, E, & F provide additional circumstances for a CINA adjudication not relevant to this case.

**7.** The May 1989 CINA adjudication was by a preponderance of the evidence. To support a termination of parental rights, the adjudication must be by a clear and convincing standard. *See* AS 47.10.080(c)(3), *infra,* n. 8.

**8.** AS 47.10.080(c) states in part,

    (c) If the court finds that the minor is a child in need of aid, it shall

    .   .   .   .   .

    (3) by order, upon a showing in the adjudication by clear and convincing evidence that there is a child in need of aid under AS 47.10.010(a)(2) as a result of parental conduct and upon a showing in the disposition by clear and convincing evidence that the parental conduct is likely to continue to exist if there is no termination of parental rights, terminate parental rights and responsibilities of one or both parents and commit the child to the department or to a legally appointed guardian of the person of the child, and the department or guardian shall report annually to the court on efforts being made to find a permanent placement for the child.

to statutory interpretation, the plainer the language of the statute the more convincing the evidence of contrary legislative intent must be). The relevant portion of AS 47.10.010(a)(2)(A) defines a child in need of aid as "the child ... having no parent, guardian, custodian, or relative caring or willing to provide care." While a finding of inability to care would be grounds for jurisdiction under subsection (2)(A), that finding must also extend to any relatives who are in fact caring for or willing to assume care.[9]

The state further argues that the evidence supports a CINA adjudication under subsections (2)(C) and (F). Subsection (2)(C) allows for a CINA adjudication if "there is an imminent and substantial risk that the child will suffer harm as a result of the actions done by or conditions created by the child's parent, ... or the failure of the parent ... adequately to supervise the child." The superior court found that "the children will be in jeopardy if left in [K.F.'s] care," and that K.F. is "unable to safely care for her children." Although

these findings fit well under subsection (2)(C), the superior court declined to base its findings on subsection (2)(C), even though requested to by DHSS.[10]

Here, CINA adjudication was the basis for terminating K.F.'s parental rights—a drastic measure. The private interest of a parent whose parental rights may be terminated is of the highest order. *In re K.L.J.*, 813 P.2d 276, 279 (Alaska 1991). Therefore, we conclude that this matter must be remanded to the superior court to determine whether it would reach the same resolution under subsection AS 47.10.010(a)(2)(C). To resolve this question, the superior court in its discretion may take additional evidence or may base its decision on the existing record.[11]

## B. *Did DHSS fail to provide reasonable remedial services to K.F.?*[12]

CINA Rule 15(g) requires that

[i]n any case in which the court has authorized the Department to remove the child from the child's home, or continued a previous order for removal, the court

---

9. Because adjudication under subsection (2)(A) normally would arise under abandonment, the state's burden usually would be minimal: abandonment is evidence that no relative is willing or able to provide care.

10. In analyzing whether the father's parental rights should be terminated, the superior court stated that the father's "conduct of leaving the children with [K.F.] alone allowed the children to be at risk and to be children in need of aid." Clearly, risk was an element of this CINA adjudication.

11. If the superior court declines to reform its findings to explicitly rely on AS 47.10.-010(a)(2)(C), then it must reach the issue of availability of relatives under AS 47.10.-010(a)(2)(A).

The state argues that K.F. waived the issue of whether the state must prove lack of relatives by not arguing it at trial and not specifying this error in her points on appeal. The state does not deny that it knew of the existence of K.F.'s relatives. However, there are no facts in the record as to the fitness or willingness of K.F.'s relatives to care for her children.

K.F. argues that the issue is jurisdictional: the state has jurisdiction over her children under AS 47.10.010(a)(2)(A) only if it first proves that there are no suitable relatives. A jurisdictional defense may be raised at any time. *Wanamaker v. Scott*, 788 P.2d 712, 713 n. 2 (Alaska 1990).

The state argues that the burden is on the parent to establish the existence of suitable relatives. If accurate, then K.F.'s failure to raise the issue at trial means that the lack of suitable relatives is affirmatively established, and the superior court would have jurisdiction to decide this case under subsection (2)(A).

Subsection (2)(A) establishes that lack of suitable relatives is a material element of a CINA adjudication under that subsection. If the state wishes to proceed under that subsection, it must prove that there are no suitable relatives. It is clear that the burden of proof under subsection (2)(A) is on the state. *R.C. v. State, Dep't of Health and Social Servs.*, 760 P.2d 501, 504 (Alaska 1988).

12. K.F.'s second specification of error goes to whether the state made a reasonable effort to return the children to K.F. Whether the state's effort was reasonable is a factual issue, and this court will reverse findings of fact only if we find them clearly erroneous. *Parker v. Northern Mixing Co.*, 756 P.2d 881, 887 n. 11 (Alaska 1988). A finding is clearly erroneous when it leaves us "with a definite and firm conviction on the entire record that a mistake has been made, although there may be evidence to support the finding." *Id.* at 891 n. 23 (citation omitted). In making this determination, we view the evidence in the light most favorable to the party prevailing below. *Id.*

shall make findings pursuant to 42 U.S.C. § 671(a)(15) as to whether, under the circumstances of the case, reasonable efforts were made to prevent or eliminate the need for removal of the child from the home and to make it possible for the child to return to the home.[13] *See also E.A. v. State,* 623 P.2d 1210, 1213 (Alaska 1981) (reasonable effort to preserve and strengthen family fulfilled by offering counseling and supervision). K.F. argues that the reunification effort of DHSS was unreasonable in that it did not take into account her disability. Specifically, K.F. notes that she had been diagnosed as being within "the borderline range of intelligence"[14] with a cognitive disability. Due to K.F.'s difficulty in processing information, particularly verbal information, clinical psychologist Richard Lazur recommended that K.F. receive "[a]ctive participation parent training classes, preferably with the children" because "[s]he prefers an active visual style of learning."

K.F. admits that DHSS had a reunification plan and that she received training in parental skills under this plan. However, K.F. believes that the plan was "fatally flawed." Between December 1988 and June 1989, DHSS sponsored supervised visits, which took place at DFYS. Additionally, during this time, the parents and the children were evaluated, and the parents attended parenting classes at the Center for Children and Parents. In June 1989, DHSS adopted a second plan which provided "hands on" learning. However, K.F. still considers the overall plan unreasonable. First, she believes that the services in the second plan were not "geared toward a developmentally disabled parent" and that "not a single service provider with any experience in working with retarded persons was assigned to the case." Second, K.F. considers it unreasonable that the second plan was only in effect for six months before DHSS petitioned for termination of her rights. She cites DHSS's CSP manual, which recommends one year of services before a decision be made to terminate rights on the basis that the client is not making progress.

The state contends that the services offered by DHSS were "well coordinated" and "geared specifically to K.F." Additionally, the state argues that "the services were in place long enough for the professionals to determine that K.F.'s abilities were not going to improve." The state cites the fact that monthly meetings were held by those involved in K.F.'s treatment plan to discuss K.F.'s case. Moreover, information on treating the developmentally disabled was obtained and distributed at these meetings. The state describes how the members of the treatment team all modified their treatment procedures to accommodate K.F.:

> During the supervised visits, Molly Heath used hands-on modeling to teach appropriate parenting skills.... In individual therapy, Dee Foster used a concrete approach to treat K.F., including the use of visual aids and videotapes. Suzanne Ascott geared the homemaker services to K.F. by using information she received from a group in Denver that works with developmentally handicapped adults, by making lists, and by writing

---

13. 42 U.S.C. § 671(a)(15) states in relevant part,

**State plan for foster care and adoption assistance**

**(a) Requisite features of State plan**

In order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which—

. . . . .

(15) ... provides that, in each case, reasonable efforts will be made ... (B) to make it possible for the child to return to his home....

*See also* CINA Rules 17(c)(3) ("In any case in which the court has authorized the Department to remove the child from the child's home or continued a previous order for removal, the court shall make the findings required by CINA Rule 15(g)") and 18(b) ("CINA Rule 17 applies to termination hearings"). Technically, this case is governed by CINA Rule 18(b), applying Rule 17(c)(3), which in turn applies Rule 15(g).

14. On a standardized intelligence test, K.F. achieved a verbal I.Q. of 72, a performance I.Q. of 95, and a full scale I.Q. of 79, placing her in the borderline range of intelligence. However, in "the ability to see relationships between things and ideas, and to classify information.... [K.F.] falls within the retarded range of functioning."

out on posterboard the safety-proofing that K.F. needed to accomplish before the children came to the home for visits. Terry Kyle, the parent/infant educator, also used every recommended avenue, including videotapes, handouts, and writing things out herself, in trying to teach K.F. the skills necessary to help the children with their delays. Public health nurse Jean Baker, who has experience in dealing with developmentally disabled adults, also made sure that she presented her instructions in a manner that was understandable to K.F.

(Citations omitted).

■ Here, the superior court did not make an explicit finding that the treatment plan was reasonable. CINA Rule 15(g) requires a finding of reasonableness. "In any case in which the court has authorized the Department to remove the child from the child's home ... the court *shall* make findings ... as to whether, under the circumstances of the case, reasonable efforts were made to ... make it possible for the child to return to the home." (Emphasis added.) Accordingly, we conclude that this question must be remanded to the superior court for a specific finding of whether reasonable efforts were made to return the children to the home. Again, the heightened burden and the drastic nature of termination of parental rights mandate a remand.

REMANDED for further proceedings in accordance with this opinion.