891 P.2d 815 (1995)
A.M., Appellant,
v.
STATE of Alaska, Appellee.
No. S-5836.
Supreme Court of Alaska.
March 10, 1995.
*818 Donna J. McCready, Asst. Public Defender, Juneau, and John B. Salemi, Public Defender, for appellant.
Jan A. Rutherdale, Asst. Atty. Gen., and Charles E. Cole, Atty. Gen., Juneau, for appellee.
Before MOORE, C.J., RABINOWITZ, MATTHEWS and COMPTON, JJ., and BRYNER, J. Pro Tem.[*]

OPINION
BRYNER, Justice Pro Tem.
A.M. appeals the termination of his parental rights to his two children, M.M. and S.M. We conclude that the superior court erred in finding that termination of A.M.'s parental rights was warranted by his physical abandonment of the children.

I. FACTS AND PROCEEDINGS

This appeal arises from the termination of A.M.'s parental rights to his minor son, M.M., and his minor daughter, S.M. The children were born in 1987 and 1989 to A.M. and S.L.S. The children are Indian children within the meaning of the Indian Child Welfare Act (ICWA), 25 U.S.C. §§ 1901-23, 1951 (1988).
In 1990, A.M. was charged with, and later convicted of, sexually abusing S.S., a child of S.L.S. by a prior relationship who lived with A.M. and S.L.S. at the time. In March 1990, after the abuse was reported, the Division of Family and Youth Services (DFYS) arranged for S.L.S. and her three children to live in a women's shelter. Upon finding that S.L.S. had left the shelter and was not keeping S.S. from A.M., DFYS took emergency custody of S.S.S.L.S. entered an alcohol treatment program shortly thereafter; A.M. took custody of M.M. and S.M., with DFYS monitoring their situation.
In September 1990, A.M. was formally charged with sexually abusing S.S.M.M. and S.M. were taken from A.M. upon his arrest and were temporarily placed in the home of a maternal great aunt in Juneau with whom S.L.S. was staying. Not long thereafter, S.L.S. left the children with a baby sitter and failed to return. On October 23, 1990, DFYS petitioned for adjudication of S.M. and M.M. as children in need of aid *819 (CINA), alleging that "[t]he children having no one to care for them are in imminent danger of physical harm or damage." A.M. and S.L.S. both stipulated that the children were in need of aid and that DFYS should assume custody for up to two years. A.M. was subsequently convicted of sexually abusing S.S. and was eventually sentenced to serve a total of ten years in prison, with one year suspended.
In June 1992, seventeen months after A.M. stipulated that M.M. and S.M. were children in need of aid, DFYS petitioned for termination of A.M.'s parental rights.[1] Superior Court Judge Walter L. Carpeneti conducted a consolidated hearing on the adjudicative and dispositional aspects of the State's petition to terminate. On August 6, 1993, Judge Carpeneti entered an order terminating A.M.'s parental rights.[2] A.M. then filed this appeal, challenging the termination order on numerous substantive and procedural grounds.

II. TERMINATION OF PARENTAL RIGHTS BASED ON CINA STATUS UNDER AS 47.10.010(a)(2)(A)

A. Statutory Framework and Standard of Review

The State petitioned to terminate A.M.'s parental rights based on the allegation that S.M. and M.M. were children in need of aid.[3] Under AS 47.10.080(c)(3), the court is authorized to terminate parental rights
upon a showing ... by clear and convincing evidence that there is a child in need of aid under AS 47.10.010(a)(2) as a result of parental conduct and upon a showing ... by clear and convincing evidence that the parental conduct is likely to continue to exist if there is no termination of parental rights....
See also CINA Rule 15(c). In order to terminate parental rights under this statute, the court must initially find grounds sufficient to warrant a CINA adjudication. Nada A. v. State, 660 P.2d 436, 439-40 (Alaska 1983). The court must then undertake a two-step inquiry: first, whether the child is a child in need of aid "as a result of parental conduct;" second, whether that conduct "is likely to continue to exist." Id. at 440 (quoting AS 47.10.080(c)(3)).
Alaska Statute 47.10.010(a)(2) specifies various substantive grounds for a CINA adjudication. Here, the State alleged that A.M.'s children were in need of aid on the alternative grounds specified in AS 47.10.010(a)(2)(A), (C), (D), and (F).[4] The only theory actively argued by the State at the termination trial, however, was abandonment under AS 47.10.010(a)(2)(A). Subsection (a)(2)(A) allows a CINA adjudication as to any "child... having no parent, guardian, custodian, or relative caring or willing to provide care, including physical abandonment...."
*820 In the context of the abandonment provision, "conduct" means the willful act of a parent. Nada A., 660 P.2d at 439; In re B.J., 530 P.2d 747, 750 n. 12 (Alaska 1975). "Whether or not there has been an abandonment within the meaning of the statute is to be determined objectively, taking into account not only the verbal expressions of the natural parents but their conduct as parents as well." D.M. v. State, 515 P.2d 1234, 1236-37 (Alaska 1973).
For purposes of termination, the State has the burden of proving both the CINA status of the child and the existence of grounds for termination by clear and convincing evidence. AS 47.10.080(c)(3); CINA Rule 15(c). In reviewing the trial court's factual findings on the issue of termination, we apply the "clearly erroneous" standard of review. E.J.S. v. State, 754 P.2d 749, 750 n. 2 (Alaska 1988). However, we must always bear in mind that "terminating parental rights [is] a drastic measure. The private interest of a parent whose parental rights may be terminated is of the highest order." In the Matter of J.L.F. and K.W.F., 828 P.2d 166, 170 (Alaska 1992).

B. Abandonment

On appeal, A.M. argues that the superior court erred in finding conduct constituting physical abandonment under AS 47.10.010(a)(2)(A). The test for abandonment under subsection (a)(2)(A) is two-pronged: the superior court must find (1) that the parent's conduct implied a conscious disregard for parental obligations; and (2) that the parent's conscious disregard led to the destruction of the relationship between the parent and the parent's children. E.g., E.J.S. 754 P.2d at 751. The superior court addressed both prongs of this test in its findings and conclusions. A.M. challenges the adequacy of the court's findings as to both prongs.

1. Conscious Disregard for Parental Duties

"The first prong of the abandonment test focuses on the objective conduct of the parents in discharging their parental responsibility. Thus, abandonment is not determined by the parent's subjective intent or on the `parent's wishful thoughts and hopes for the child.'" Id. (quoting D.M., 515 P.2d at 1237). One's parental duty is "an `affirmative duty ... which requires [a] continuing interest in the child and a genuine effort to maintain communication and association with the child.'" E.J.S., 754 P.2d at 751 (alterations in original) (quoting In re Burns, 474 Pa. 615, 379 A.2d 535, 540 (1977)).
In reaching the conclusion that A.M. had consciously disregarded his parental obligations to M.M. and S.M., the court focused on A.M.'s pre-incarceration conduct, which included
his long history of severe drug and alcohol abuse, his long history of committing crimes (including sexual abuse of his stepdaughter), his inability to provide consistent support and nurture for his children, his constant moving of the children, his long history of physical attacks upon their mother, and numerous episodes of leaving the children for substantial periods.
The superior court found that this conduct "evidence[d] ... [A.M.'s] disregard for his parental obligations to care for his children, that is, his obligation to provide for their physical, emotional, mental and social needs."
The record demonstrates that the superior court considered the totality of A.M.'s conduct prior to his incarceration. Although that conduct included the acts for which he was ultimately imprisoned, the court did not rely on the mere fact of A.M.'s incarceration in finding that he had consciously disregarded his parental duties. This accords with existing law.[5]
The State argues that the superior court was not clearly erroneous in finding *821 that A.M.'s pre-incarceration conduct, including the acts of sexual abuse for which he was imprisoned, evidenced a conscious disregard for his parental duties. We agree. Ample evidence supports the superior court's finding that, objectively viewed, A.M.'s shiftless lifestyle, frequent absences from home, drug and alcohol abuse, physically assaultive conduct, and sexually abusive acts toward his stepdaughter manifested a disregard for his obligations as a parent. The superior court's finding of conscious disregard was not clearly erroneous.

2. Destruction of the Parent-Child Relationship

The second prong of the abandonment test requires the State to show that the parent's disregard has caused a destruction of the parent-child relationship. In re B.J., 530 P.2d at 749.
To support its claim that the parent-child relationship was destroyed, the State relied below, as it does here, on the testimony of Kathryn Donely Ziegler, an expert in child welfare placement work who had extensive experience in the placement of special needs children. Ziegler's testimony addressed the concept of a "psychological parent." Ziegler explained:
There can be the parents who gave you birth, the parents who gave you early care, the parents who help you grow up and grow and develop and ... are, in fact, in a relationship with you in an ongoing sort of way. The distinction I would always make with kids who are in an adoption or foster care status is over here are the parents who are responsible for you, for producing you ..., but that is not always the same person who [is], in fact, going to help you get grown, who is going to stay connected with you through the rest of your life; and it's that parent, it's that, so to speak, that psychological parent that we really have to search out for kids and make sure that person is available to the kids.
Ziegler went on to state her opinion that the current foster mother of A.M.'s children appeared to have become the children's psychological parent:
I think [the children] have this fix on their present foster parent as being the significant and psychological parent in their lives because she's been there. I mean when these kids are sick in the middle of the night she's there. When these kids are crying, worried about something, she's the one that they turn to, you see, so she becomes the psychological parent and, of course, even [M.M.] was very young when he came to her as a small child still suffering what he had experienced in life. So  but I don't mean to diminish the role of the father in this case, he's important to these children, he will be important in their life span. I mean because people have these feelings about, well, that's my dad... . But as far as being the psychological parent I think it's pretty clear ... that [the foster mother] . .. is, indeed, the psychological parent of both of these kids.
The superior court found Ziegler's testimony compelling and relied on it in concluding that A.M.'s conscious disregard of his parental duties had resulted in the destruction of the parent-child relationship. Specifically, the court determined that A.M. was no longer the psychological parent of his children, a role that, in the court's view, had been taken on since A.M.'s incarceration by the children's foster mother. The court believed the surviving relationship between A.M. and his children to be "akin to the relationship between a child and an uncle the child sees only occasionally: love and respect, but not a parental relationship."
The State concedes that "[A.M.] was very much a part of his children's lives before he was incarcerated, and while incarcerated has continued to take an active interest in them." The State nevertheless contends that, even though A.M. did not abandon M.M. and S.M. "in the normal sense of the term," abandonment was established. We find this argument problematic in two respects.

a. Psychological Parenthood as the Equivalent of an Adequate Parent-Child Relationship

The superior court found that, despite the "love and affection" between A.M. and his children, A.M.'s parent-child relationship *822 had been destroyed because the children's foster mother had become their psychological parent. This finding necessarily suggests that a complete destruction of the parent-child relationship need not be proved to establish abandonment. Instead, a qualitative diminution of the original parent-child relationship will suffice under certain circumstances  those circumstances being defined by the concept of psychological parenthood.
However, use of the concept of psychological parenthood in this manner has troubling implications. For example, Ziegler's testimony, when applied in the context of a typical divorce, would seem to indicate that a parent who is awarded primary custody of the children will almost certainly assume the role of psychological parent, whereas the non-custodial parent, lacking the ability to "be there," will be relegated to some lesser form of bond. If, as the superior court appears to have found, being a psychological parent is a necessary ingredient for an adequate parent-child relationship, then termination might routinely be justified for the non-custodial parent in a divorce.
This, of course, is not the law. As illustrated by the foregoing example, the absence of a "psychological parent" bond cannot, standing alone, be equated to the destruction of a parent-child relationship. This is not to say that the concept of psychological parenthood is invalid. However, concepts developed and applied within the spheres of social science do not always mesh neatly with rules traditionally applied within the spheres of the law  legal rules developed for the regulation of individual rights. It is one thing to say that psychological parenthood is a legitimate and useful concept in the placement of special needs foster children; it is quite another to conclude, as rigid legal doctrine, that psychological parenthood is the sole legal determinant of a viable parent-child relationship in termination of parental rights cases. Our own decisions have never ascribed to the latter proposition.[6] The State cites no authority  legal or scientific  to support such a view, and we are aware of none.

b. Disregard of Parental Obligations and Destruction of the Parent-Child Relationship

The superior court's reliance on the foster mother's psychological parent role in finding the destruction of the parent-child relationship between A.M. and his children is problematic for another reason. As we have already indicated, under the second prong of the abandonment test, the court must determine that the parent's "conscious disregard ... led to the destruction of the parent-child relationship." E.J.S., 754 P.2d at 751 (emphasis added). An integral part of this requirement is the existence of a causal connection between the parental disregard found under the first prong of the test and the destruction of the parent-child relationship found under the second.
Thus, under the second prong of the abandonment test, it is insufficient to find parental disregard coupled with a destruction of the parent-child relationship brought about by some other cause. The destruction must be brought about by the acts of the parent, and in order to constitute abandonment, the acts of the parent must be willful. In re B.J., 530 P.2d at 750 n. 12; see also Nada A., 660 P.2d at 439.
Here, the parental disregard relied on by the superior court in finding abandonment consisted of A.M.'s pre-incarceration conduct. Yet the court's conclusion that A.M.'s parent-child relationship had been destroyed was based on the existence of a psychological parent relationship between the children and their current foster mother, and the consequent absence of such a relationship between A.M. and his children.
From the record, it seems clear that the relative distancing of A.M.'s relationship with *823 his children and their formation of a close relationship with their foster mother resulted not from A.M.'s pre-incarceration conduct, but rather from the fact of his incarceration. Ziegler did express the opinion that A.M. was not a psychological parent to his children. However, Ziegler's opinion was based on the amount of time that had elapsed since the children had been removed from A.M.'s custody, not on the nature or effect of A.M.'s conduct toward the children prior to his arrest. When asked whether A.M. was the psychological parent, Ziegler replied:
Well, I couldn't believe that to be the case given the ages of the children at the last full parenting contacts that they've had. I'm sure that they recognize  certainly [M.M.] does recognize him as his dad, I'm sure of that. I'm not clear that [M.M.] understands what all of that means. I think he and [S.M.] have this fix on their present foster mother as being the significant and psychological parent in their lives because she's been there.[[7]]
The superior court made extensive and detailed findings concerning the harm that A.M.'s criminal and anti-social conduct caused to his children. These findings are supported by the record. Nevertheless, the State did not attempt to prove, and the court did not purport to determine, the nature of the parent-child relationship that existed at the time A.M. was arrested and his children were removed from his custody. Despite the evidence indicating that A.M.'s disregard of his parental responsibilities had harmed his children, the superior court did not find that A.M.'s conduct had already destroyed the parent-child relationship when he was arrested and incarcerated for his current offenses; nor did the court find that A.M.'s anti-social conduct, rather than his post-arrest separation, was directly responsible for destroying the parent-child bond.
In sum, to the extent the record supports the conclusion that A.M.'s parent-child relationship has been destroyed, that destruction appears to have resulted from the fact of his incarceration. However, A.M.'s incarceration could not serve as the proper basis for a finding of destruction of the parent-child relationship, since it was not the conduct upon which the court relied in finding that A.M. had consciously disregarded his parental obligations.[8] Conversely, the *824 conduct involved in A.M.'s conscious disregard of his parental obligations was not the conduct that "led to the destruction of the parent-child relationship."
The superior court's conclusion that A.M.'s disregard of his parental responsibilities led to the destruction of his parent-child relationship is not supported by substantial evidence and is therefore clearly erroneous.

C. Inability to Provide Care

The State alternatively contends that the superior court's order terminating A.M.'s parental rights based on the CINA status of his children can be affirmed even if the court's finding of abandonment cannot be sustained. The State points out that, given A.M.'s disregard of his parental responsibilities, he clearly lacked the ability to provide his children with care. The State argues that, for this reason, A.M.'s children could properly be adjudicated children in need of aid under AS 47.10.010(a)(2)(A), regardless of whether A.M.'s conduct amounted to abandonment.
The State's argument is to a certain extent plausible. Abandonment is but one way of establishing CINA status under AS 47.10.010(a)(2)(A) for purposes of terminating parental rights. Subsection (a)(2)(A) also applies when no parent, guardian, custodian, or relative is willing and able to provide care. See In the Matter of J.L.F., 828 P.2d at 170. Unlike abandonment, proof of parental inability to provide care does not require a showing that the parent-child relationship has been destroyed.
The superior court found that, in disregarding his parental responsibilities to his children, A.M., in effect, failed in "his obligation to provide for their physical, emotional, mental and social needs." This finding is arguably tantamount to a finding of A.M.'s inability to care for his children, since "care" has been defined as providing "for the physical, emotional, mental, and social needs of the child." AS 47.10.990(1); In the Matter of J.L.F., 828 P.2d at 169. As we have indicated in discussing the issue of parental disregard, there is substantial evidence in the record to support this finding.[9]
Nevertheless, the superior court did not expressly conclude that A.M.'s children were in need of aid under AS 47.10.010(a)(2)(A) due to A.M.'s inability to provide for their care. Instead, the court based its finding of CINA status on the conclusion that A.M. had abandoned the children, a conclusion we have found to be clearly erroneous. More significantly, we have made it clear that, "[w]hile a finding of inability to care would be grounds for jurisdiction under subsection (a)(2)(A), that finding must also extend to any relatives who are in fact caring for or willing to assume care." In the Matter of J.L.F., 828 P.2d at 170. Here, even if we were to construe the finding of parental disregard that the superior court made in connection with the abandonment issue as an implied finding of inability to provide care, the superior court failed to enter findings on a material element of inability: the lack of any relatives caring or willing to provide care.[10]See id. at 170 & n. 11.
We accordingly conclude that the superior court's finding of CINA status cannot be affirmed on the alternative ground of inability to provide care. We therefore find it necessary to vacate the disputed termination order and to remand this case for further *825 consideration of the issue of inability to provide care.

D. Remaining Substantive Issues

Although the challenged termination order must be vacated, we think it necessary to address the remaining substantive issues raised by A.M. in order to clarify the posture of the case on remand.

1. The Likelihood of A.M.'s Conduct Continuing

To justify termination of parental rights following a child's CINA adjudication, the State must prove by clear and convincing evidence that the child is a child in need of aid "as a result of parental conduct" and that the conduct "is likely to continue to exist." AS 47.10.080(c)(3); see also CINA Rule 18(c)(1); Nada A., 660 P.2d at 440.
In the present case, after concluding that M.M. and S.M. were children in need of aid as a result of A.M.'s conduct, the superior court found that
[A.M.] is highly likely to continue to abuse drugs and alcohol, to commit crimes (especially assaultive crimes in the context of domestic disputes and sexual offenses against children, but also property crimes given his extensive criminal record, his lack of success in substance abuse treatment, his poor prognosis for sexual offender treatment, his failure even to obtain anger management counseling, and his characterological problems).
These express findings are supported by evidence in the record. Although A.M. points to contrary evidence that he presented, it is not this court's job to reweigh the evidence when the record provides clear support for the superior court's ruling. Our review of the record convinces us that the superior court's ruling is not clearly erroneous.
We emphasize that just as incarceration is not conduct under a physical abandonment theory, see supra note 5, neither is incarceration itself "parental conduct" within the meaning of AS 47.10.080(c)(3). Thus, while long-term incarceration of a parent can result in a child becoming a child in need of aid under AS 47.10.010(a)(2)(A) under an inability to provide care theory, such incarceration is not a sufficient basis to justify termination of parental rights under AS 47.10.080(c)(3). In this case we understand that the trial court did not rely on A.M.'s long-term incarceration, but on his continuing serious criminal and anti-social conduct.

2. Likelihood of Physical and Emotional Harm if A.M.'s Rights are Not Terminated

As a prerequisite to termination of parental rights under ICWA § 102(f), 25 U.S.C. § 1912(f) (1988), and Alaska Child in Need of Aid Rule 18(c)(2), the State must prove beyond a reasonable doubt that continued custody of the child by the parent is likely to result in serious emotional or physical damage to the child.

a. Physical Harm

The superior court specifically found, beyond a reasonable doubt, that A.M.'s daughter was likely to suffer sexual abuse if placed in his custody; that both children were likely to suffer physical abuse resulting from A.M.'s domestic violence; and that both were likely to suffer physical deprivation due to A.M.'s inability to meet their needs on a consistent, ongoing basis.
A.M. argues that the State failed to allege the likelihood of future physical harm and that the evidence it presented failed to prove such harm beyond a reasonable doubt.
A.M.'s first argument is mistaken. The State's petition expressly alleged that the children would be "at risk of sexual abuse, physical harm, neglect or abandonment due to substance abuse or criminal behavior leading to further incarceration" unless A.M. completed a long-term treatment program for sexual offenders and reversed his long-standing personality traits and behavioral trends.
A.M.'s second argument is unpersuasive. The superior court's findings on the issue of future physical harm are amply supported by the record.

*826 b. Emotional Harm

A.M. claims that it was error for the superior court to consider, in assessing the likelihood of emotional harm in the event of a return of custody to him, factors such as the prolonged separation that would inevitably occur before the restoration of custody and the need, in the interim, to assure the stability of the bonds the children had formed with their "psychological parent." A.M. contends that these considerations are irrelevant to whether the children would suffer emotional damage if they returned to him.
It is true that mere evidence that a willing custodian other than the parent would do a better job than the parent does not in itself suffice to support a finding of likely emotional harm. See Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed.Reg. 67,584, 67,593 (Bureau of Indian Affairs, Dep't of the Interior 1979). But the close ties the children enjoyed to their foster mother and the effects A.M.'s prolonged separation would likely have on their mental health if eventually returned could properly be considered as relevant evidence bearing on the issue of likely emotional harm. Three expert witnesses addressed this subject and their testimony supports the court's findings. The superior court was not clearly erroneous in finding that continued custody by A.M. would likely cause the children serious emotional harm.

3. Active Remedial Efforts by the State

Under ICWA § 102(d), before parental rights may be terminated, the State has the burden of showing by a preponderance of the evidence that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful." 25 U.S.C. § 1912(d) (1988); see also CINA Rule 18(c)(2); K.N. v. State, 856 P.2d 468, 476 (Alaska 1993).
The superior court found that DFYS had "made active efforts to provide remedial services and rehabilitative programs to prevent the breakup of this family but those efforts have proved unsuccessful... ." In the superior court's view, the State had done everything "feasible given [A.M.'s] incarceration status... ."[11] In reaching this conclusion, the court observed that "[A.M.] has expressed a willingness and desire to undergo sex offender treatment while incarcerated, but substantial doubt on the motivation of that expressed willingness was raised by the State's expert witnesses. The court concludes that Mr. [A.M.] is not sincerely interested in changing his deviant sexual behavior... ."
The extent of active efforts the State must make on behalf of a parent whose access to remedial assistance is hampered by incarceration is an issue that remains largely unresolved.[12] The State does not deny that the "reunification plan" it formulated for A.M. *827 could not realistically be attained given his imprisonment and that DFYS personnel generally failed to intervene actively on A.M.'s behalf to assure that prison officials enrolled A.M. in suitable institutional programs. The State simply claims that, by preparing a reunification plan and encouraging A.M. to seek services available within the institution, it fulfilled its duty of making active efforts to provide remedial services.
To the extent the State's argument suggests that this court create an exception to ICWA's requirement of active remedial efforts for cases in which rehabilitation is doubtful and in which active remedial efforts would be "unreasonably" costly or time-consuming, the suggestion seems unjustified. We have held that no judicial exception to ICWA can be created. A.B.M. v. M.H., 651 P.2d 1170, 1173 (Alaska 1982). Neither incarceration nor doubtful prospects for rehabilitation will relieve the State of its duty under ICWA to make active remedial efforts.
This does not mean that a parent's incarceration is wholly irrelevant to the scope of active remedial efforts the State is required to undertake. The circumstances surrounding a parent's incarceration may have a direct bearing on what active remedial efforts are possible. In the present case, for example, it would be difficult to conclude that the practical obstacles posed by A.M.'s incarceration  the difficulty of providing resources to inmates generally, the unavailability of specific resources in A.M.'s case, and the length of time A.M. will remain incarcerated  are factors that the superior court was barred from considering when it decided whether the State had made active remedial efforts.
Likewise, we have recently noted that, for purposes of determining the sufficiency of the State's remedial efforts, the superior court may properly consider a parent's demonstrated lack of willingness to participate in treatment. See K.N., 856 P.2d at 477. Case law in other jurisdictions appears to be in accord with this general view. See Matter of Maricopa County Juvenile Action No. JS-8287, 171 Ariz. 104, 828 P.2d 1245, 1254 (App. 1991); Matter of M.E.M., 209 Mont. 192, 679 P.2d 1241, 1244 (1984); State ex rel. Juvenile Dep't of Multnomah County v. Woodruff, 108 Or. App. 352, 816 P.2d 623, 626 (1991).
In this regard, however, a note of caution is necessary. The foregoing cases involve parents who actively refused to participate in or cooperate with treatment efforts; these cases support the general proposition that, once active remedial efforts have been undertaken, a parent's actual resistance to or rejection of assistance may properly be considered in determining whether additional efforts were required. We have never suggested that the scope of the State's duty to make active remedial efforts should be affected by a parent's motivation or prognosis before remedial efforts have commenced. To vary the scope of the State's ICWA duty based on subjective, pre-intervention criteria such as a parent's motivation or treatment prognosis might defeat the purpose of the active remedial effort requirement, for it would enable the State to argue, in all doubtful and difficult cases, that it had no duty to make active remedial efforts.
In the present case, the superior court's finding of compliance with the ICWA requirement presents a close question, particularly because the court's assessment of the active efforts that the State should have made was apparently influenced by its perception that, despite his avowed willingness to participate in treatment, A.M. had made no genuine commitment to rehabilitation and his prospects for rehabilitation were poor. Since we must in any event remand this case for reconsideration on the issue of inability to provide care, we believe it appropriate to require that the superior court also reconsider the issue of ICWA compliance in light of the factors outlined in this opinion. In addressing the issue on remand, the court should allow the parties to present updated information concerning any treatment A.M. may have received since the court's initial ruling.

III. PROCEDURAL ISSUES

In addition to his substantive arguments, A.M. raises two procedural issues that call for only brief discussion.

*828 A. Denial of Bifurcation

Prior to his hearing, A.M. moved for bifurcation, seeking to have the adjudicative phase, in which the court determines whether the children are in need of aid under AS 47.10.010, heard before the dispositional phase, in which the court determines whether the requirements for termination have been met under AS 47.10.080(c). The superior court denied this motion. A.M. contends that the failure to bifurcate amounted to an abuse of discretion and violated his right to due process.
We find no merit to this argument. Although the adjudicative and dispositional phases of children's proceedings are typically heard separately, CINA Rule 18(b) expressly makes joinder of the two phases a matter of discretion for the superior court:
Upon a showing of good cause and with adequate notice to the parties, an adjudication hearing and a termination hearing may be consolidated.
Here, a significant amount of the evidence presented below was relevant to, and could have been admitted at, both phases of the termination proceeding. Because A.M.'s children had been in foster care for a lengthy period of time prior to the filing of the petition for termination, the evidence on the issue of disposition was well developed prior to the CINA adjudication, and A.M. received ample notice of the State's claims. A.M. has failed to point to any specific circumstances indicating an abuse of discretion by the superior court. He has also failed to cite any authority supporting the proposition that bifurcation is per se necessary to satisfy the requirements of procedural due process. Finally, A.M. has failed to make a convincing showing of prejudice. The superior court did not abuse its discretion in failing to bifurcate the termination trial.

B. Absence of the Guardian Ad Litem

A.M. additionally claims error because the children's guardian ad litem did not attend the termination trial. A.M. failed to raise this issue below; consequently, we review only for plain error. Plain error exists when an error affects substantial rights and is obviously prejudicial. R.C. v. State, 760 P.2d 501, 505 n. 14 (Alaska 1988). Because the report of the guardian ad litem favored termination of parental rights and because the guardian's absence enabled A.M. to ensure that the report would not be admitted as evidence, there appears to be a strong possibility that A.M.'s failure to object below amounted to a sound tactical choice. In any event, given the guardian's position favoring termination, the guardian's absence cannot be characterized as "obviously prejudicial." Id. The record discloses no plain error.

IV. CONCLUSION

The superior court's finding of abandonment was clearly erroneous; this error requires that the order of August 6, 1993, terminating A.M.'s parental rights be vacated. A remand is necessary, however, for further proceedings to determine whether A.M.'s children should be adjudicated CINA due to A.M.'s inability to provide care and, if so, whether termination of parental rights is warranted under that theory. On remand, the superior court should also reconsider whether the State has complied with ICWA's requirement of active remedial efforts.
Accordingly, the order terminating A.M.'s parental rights is VACATED, and this case is REMANDED for further proceedings consistent herewith.
COMPTON, Justice, with whom RABINOWITZ, Justice, joins, concurring.
Once again the textual fabric of AS 47.10.080 confines us to an uncomfortable fit. See Nada A. v. State, 660 P.2d 436, 441-43 (Alaska 1983) (Compton, J., concurring). A.M. is serving a prison term of almost ten years for sexually abusing his stepdaughter. However, we are unable to affirm the termination of his parental rights. I agree with our disposition of the legal issues in this case because I do not believe the wording of the statutes give us any choice. Further, the doctrine of stare decisis commands that we follow statutory interpretation established by precedent. I write separately to express my continuing belief that a legislative response to this issue is appropriate, and also that it is now long overdue.
*829 When we, as a society, terminate parental rights, we sever the fundamentally important relationship between parent and child. In our society this relationship is highly valued, yet at times it must be severed. We sever it only when the health and safety of the child mandate that we do so. The balancing of the parental relationship against the health and safety of the child is a complex decision replete with social policy choices. However, the task of determining desirable social policy in the sphere of preservation or termination of the parent-child relationship is a task which courts are not equipped to undertake. It is not a sphere in which the judiciary should engage in social engineering.
In Nada A., I urged the Alaska Legislature to define more clearly the effect of incarceration on parental rights. Id. at 441. I do so again. What is needed is an informed social policy. The fact that difficult social policy choices must be made is not a justification for ignoring the issues from which the difficulties have sprung. I think it unfortunate that the legislature continues to ignore the effect of a parent's incarceration on a child and on the continuation of the parent-child relationship.
NOTES
[*] Sitting by assignment made under article IV, section 16 of the Alaska Constitution.
[1] DFYS did not seek to terminate S.L.S.'s parental rights at that time.
[2] Although the State petitioned only to terminate A.M.'s parental rights and did not request termination of S.L.S.'s parental rights, Judge Carpeneti's August 6, 1993, order purported to terminate the parental rights of both parents. S.L.S. did not contest Judge Carpeneti's order and, on November 23, 1993, executed a voluntary relinquishment of her parental rights. Hence, the propriety of the court's order with respect to S.L.S. is now moot.
[3] In alleging that M.M. and S.M. were children in need of aid for purposes of termination, the State did not attempt to rely on A.M.'s stipulation to the original, October 23, 1990, CINA petition.
[4] Alaska Statute 47.10.010(a)(2) specifies that the court may order the State to assume custody of a minor who is found to be a child in need of aid as a result of

(A) the child ... having no parent, guardian, custodian, or relative caring or willing to provide care, including physical abandonment by
(i) both parents[;]
... .
(C) the child having suffered substantial physical harm or if there is an imminent and substantial risk that the child will suffer such harm as a result of the actions done by or conditions created by the child's parent ... or the failure of the parent . .. adequately to supervise the child;
(D) the child having been, or being in imminent and substantial danger of being, sexually abused ... by the child's parent ...;
... .
(F) the child having suffered substantial physical abuse or neglect as a result of conditions created by the child's parent... .
[5] We have previously suggested that incarceration cannot in itself constitute physical abandonment because it does not involve willful conduct. See Nada A., 660 P.2d at 439; see also E.J.S., 754 P.2d at 752 n. 4; In re B.J., 530 P.2d at 750 n. 12. However, we have never suggested that willful conduct that results in incarceration cannot be considered in determining disregard of parental obligations in the abandonment context. See E.J.S., 754 P.2d at 752 n. 4; Nada A., 660 P.2d at 441 (Compton, J., concurring).
[6] By way of illustration, the present case stands in sharp contrast to the circumstances in which we recently found destruction of the parent-child relationship in E.J.S., 754 P.2d at 751. There, testimony showed that the child, L.M.S., had virtually no exposure to her natural father since infancy; that she considered her stepfather to be her natural father; that L.M.S. had only recently discovered that her stepfather was not her real father; that even then L.M.S. never asked for detail about her natural father; and that no psychological bond or familial relationship at all existed between L.M.S. and her natural father.
[7] In this regard, the Findings and Conclusions entered by the superior court are somewhat ambiguous. As a conclusion of law, the court stated that "[t]he disregard shown by [A.M.] for [his] parental obligations has led to the destruction of the parent-child relationship... ." In reaching this conclusion, the court, recognizing the decision in Nada A., indicated that it had considered "all of the past conduct" of A.M., but not the "mere fact of his incarceration... ." This legal conclusion suggests a predicate factual determination that A.M.'s pre-arrest conduct caused the destruction of the parent-child relationship.

However, the superior court's findings of fact do not draw any specific connection between A.M.'s pre-incarceration conduct and the destruction of his parent-child relationship. On this issue, the findings of fact merely state that A.M. is not the psychological parent of M.M. and S.M. and that their current foster mother "fills the role in their lives of psychological foster parent. Accordingly, the parent-child relationship between [A.M.] and [M.M.] and between [A.M.] and [S.M.] has been destroyed." This finding suggests that, in the court's view, it was A.M.'s replacement by the foster parent rather than his pre-incarceration disregard of parental obligations that destroyed the parent-child relationship. As we have pointed out in the text of this opinion, this latter theory of destruction is the only one that finds substantial support in the evidence.
[8] Indeed, A.M.'s incarceration is not the type of willful act upon which abandonment may be based. Nada A., 660 P.2d at 439. The State nevertheless invites us to hold that A.M. was incarcerated as a result of his voluntary acts, that his incarceration was a foreseeable consequence of his misconduct, that the inability to provide for his children resulting from A.M.'s incarceration is therefore a result of his voluntary conduct, and that, in this sense, A.M.'s parent-child relationship has been destroyed by his pre-incarceration disregard of his parental duties. In support of this theory, the State cites a number of cases that liken voluntary criminal acts to acts of abandonment. See, e.g., Hutson v. Haggard, 475 S.W.2d 330, 333 (Tex. App. 1971); In re Dobbs, 12 Wash. App. 676, 531 P.2d 303 (1975).

The State's theory is essentially the same theory addressed by Justice Compton's concurrence in Nada A., 660 P.2d at 441. The gist of Justice Compton's Nada A. concurrence, however, was that termination of parental rights under this theory was impermissible under the statutory framework then in existence. Justice Compton urged the legislature to amend Alaska law to allow termination under this theory. Id. The statutory framework in existence when Nada A. was decided remains essentially unchanged, despite the concurring opinion. We decline the State's invitation to adopt this theory in the absence of a statutory change.
[9] The conduct that led the court to find parental disregard  and, arguably, by extension, inability to provide care  consisted of A.M.'s substance abuse, violence, excessive mobility, and criminal acts, including A.M.'s sexual abuse of his stepdaughter. Notably, in A.H. v. State, 779 P.2d 1229, 1232 (Alaska 1989), this court indicated that a continuation of CINA status could in part be justified by the children's unwillingness and inability to live with a parent who was imprisoned for sexual abuse.
[10] It is the State's burden to prove that there are no suitable relatives. In the Matter of J.L.F., 828 P.2d at 170 n. 11. We note that the superior court's finding of abandonment and its order terminating A.M.'s parental rights also extended to S.L.S., the mother of the children. Hence, any implicit finding of inability to provide care obviously extended to S.L.S., who has not contested the court's ruling.
[11] The court's findings enumerate DFYS's efforts. These included monitoring A.M.'s care of the children before he was incarcerated; facilitating monthly visits at jail (under the court's order); facilitating daily telephone contacts at first, eventually dropping to weekly telephone contacts; and promulgating a reunification plan in October 1991, while A.M. was imprisoned, which was "centered around completing whatever sex offender treatment was needed (and obtaining an in-depth psychological evaluation to determine appropriate treatment) and completing appropriate alcohol/drug abuse treatment."
[12] The "active efforts" required by ICWA have not been defined. According to one authority, "[t]he distinguishing word in the remedial services and rehabilitative programs' section is the word `active.'" Craig J. Dorsay, The Indian Child Welfare Act and Laws Affecting Indian Juveniles Manual 157 (1984). Dorsay quotes one of ICWA's drafters, who distinguishes between active and passive rehabilitative and remedial efforts:

Passive efforts are where a plan is drawn up and the client must develop his or her own resources towards bringing it to fruition. Active efforts, the intent of the drafters of the Act, is where the state caseworker takes the client through the steps of the plan rather than requiring that the plan be performed on its own. For instance, rather than requiring that a client find a job, acquire new housing, and terminate a relationship with what is perceived to be a boyfriend who is a bad influence, the Indian Child Welfare Act would require that the caseworker help the client develop job and parenting skills necessary to retain custody of her child.
Id. at 157-58.